# ORIGINAL

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

```
)
JAMES NUGENT, Individually and On   )
Behalf of All Others Similarly      )   CIVIL ACTION NO. _____
Situated,                           )
                                    )   1:03-CV-0817 TWT
                 Plaintiff,         )
                                    )   CLASS ACTION COMPLAINT
       vs.                          )   FOR VIOLATIONS OF
                                    )   FEDERAL SECURITIES LAWS
AFC ENTERPRISES, INC., FRANK        )
BELATTI and GERALD J. WILKINS,      )
                                    )   JURY TRIAL DEMANDED
                 Defendants.        )
                                    )
```

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by AFC Enterprises, Inc. ("AFC" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional



evidentiary support will exist for the allegations set forth
herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of
purchasers of the common stock of AFC between March 2, 2001 and
March 24, 2003, inclusive (the "Class Period"), seeking to pursue
remedies under the Securities Exchange Act of 1934 (the "Exchange
Act").

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to
Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b)
and 78t(a)] and Rule 10b-5 promulgated thereunder by the
Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-
5].

3.    This Court has jurisdiction over the subject matter of
this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the
Exchange Act [15 U.S.C. § 78aa].

4.    Venue is proper in this District pursuant to Section 27
of the Exchange Act, and 28 U.S.C. § 1391(b), as many of the acts

2

and practices complained of herein occurred in substantial part in this District.

5.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

### PARTIES

6.    Plaintiff James Nugent, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of AFC at artificially inflated prices during the Class Period and has been damaged thereby.

7.    Defendant AFC is a Minnesota corporation with its principal place of business located at Six Concourse Parkway, Suite 1700, Atlanta, GA 30328.  AFC operates, develops and franchises quick-service restaurants (QSRs), bakeries and cafes, primarily under the trade names Popeyes Chicken & Biscuits, Church's Chicken, Cinnabon, Seattle's Best Coffee and Torrefazione Italia Coffee.

3

8.    (a)    Defendant Frank Belatti, ("Belatti") served as AFC's Chairman and Chief Executive Officer during the Class Period.

(b)    Defendant Gerald Wilkins ("Wilkins") served as AFC's Chief Financial Officer and Executive Vice President during the Class Period.

(c)    Defendants Belatti and Wilkins are referred to herein as the "Individual Defendants."

9.    Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.   It is appropriate to treat the Individual Defendants as
a group for pleading purposes and to presume that the false,
misleading and incomplete information conveyed in the Company's
public filings, press releases and other publications as alleged
herein are the collective actions of the narrowly defined group
of defendants identified above.  Each of the above officers of
AFC, by virtue of their high-level positions with the Company,
directly participated in the management of the Company, was
directly involved in the day-to-day operations of the Company at
the highest levels and was privy to confidential proprietary
information concerning the Company and its business, operations,
growth, financial statements, and financial condition, as alleged
herein.   Said Defendants were involved in drafting, producing,
reviewing and/or disseminating the false and misleading
statements and information alleged herein, were aware, or
recklessly disregarded, that the false and misleading statements
were being issued regarding the Company, and approved or ratified
these statements, in violation of the federal securities laws.

11.   As officers and controlling persons of a publicly-held
company whose common stock was, and is, registered with the SEC

pursuant to the Exchange Act, and was traded on the NASDAQ
National Market ("NASDAQ"), and governed by the provisions of the
federal securities laws, the Individual Defendants each had a
duty to disseminate promptly, accurate and truthful information
with respect to the Company's financial condition and
performance, growth, operations, financial statements, business,
markets, management, earnings and present and future business
prospects, and to correct any previously-issued statements that
had become materially misleading or untrue, so that the market
price of the Company's publicly-traded common stock would be
based upon truthful and accurate information.  The Individual
Defendants' misrepresentations and omissions during the Class
Period violated these specific requirements and obligations.

    12.  The Individual Defendants participated in the drafting,
preparation, and/or approval of the various public and
shareholder and investor reports and other communications
complained of herein and were aware of, or recklessly
disregarded, the misstatements contained therein and omissions
therefrom, and were aware of their materially false and
misleading nature.  Because of their Board membership and/or

executive and managerial positions with AFC, each of the
Individual Defendants had access to the adverse undisclosed
information about AFC's financial condition and performance as
particularized herein and knew (or recklessly disregarded) that
these adverse facts rendered the positive representations made by
or about AFC and its business issued or adopted by the Company
materially false and misleading.

13.   The Individual Defendants, because of their positions
of control and authority as officers and/or directors of the
Company, were able to and did control the content of the various
SEC filings, press releases and other public statements
pertaining to the Company during the Class Period.   Each
Individual Defendant was provided with copies of the documents
alleged herein to be misleading prior to or shortly after their
issuance and/or had the ability and/or opportunity to prevent
their issuance or cause them to be corrected.   Accordingly, each
of the Individual Defendants is responsible for the accuracy of
the public reports and releases detailed herein and is therefore
primarily liable for the representations contained therein.

14.   Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AFC common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.   The scheme:   (i) deceived the investing public regarding AFC's business, operations, management and the intrinsic value of AFC common stock; and (ii) caused Plaintiff and other members of the Class to purchase AFC common stock at artificially inflated prices.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the common stock of AFC between March 2, 2001 and March 24, 2003, inclusive (the "Class Period") and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

8

16.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AFC common shares were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AFC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that custom-arily used in securities class actions.

17.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

18.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.   Common questions of law and fact exist as to all mem-bers of the Class and predominate over any questions solely

9

affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AFC; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

20.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

10

## SUBSTANTIVE ALLEGATIONS

### Background Facts

21.  AFC operates, develops and franchises quick-service restaurants (QSRs), bakeries and cafes, primarily under the trade names Popeyes Chicken & Biscuits, Church's Chicken, Cinnabon, Seattle's Best Coffee and Torrefazione Italia Coffee. As of December 30, 2001, AFC operated and franchised 3,857 restaurants, bakeries and cafes in 47 states, the District of Columbia, Puerto Rico and 33 foreign countries. The Company also sells specialty coffees through wholesale and retail distribution channels under the Seattle Coffee brands. Popeyes is a QSR engaged in the Cajun foods segment of the industry; Church's serves traditional southern fried chicken; Cinnabon is a cinnamon roll bakery QSR concept; Seattle Coffee operates 176 cafes in the United States; Seattle's Best Coffee is a domestic specialty coffee brand, and Torrefazione operates retail cafes in Boston, Chicago, Dallas, Portland, San Francisco, Seattle and Vancouver.

22.  On March 24, 2003, after the close of the market, AFC shocked the market by announcing that it would be restating its financial statements for fiscal year 2001 and the first three

11

quarters of 2002.  The Company also reported that it was

examining whether or not its financial statements for fiscal year

2000 should be restated.  The press release stated in pertinent

part as follows:

> On January 16, 2003, the Company announced plans to
> record an impairment charge related to the carrying
> value of certain long-lived assets at its restaurants,
> bakeries and cafes and other non-cash charges,
> including charges related to fixed asset and leasehold
> improvement write-offs. The Company originally intended
> to record these charges in the fourth quarter of 2002,
> but now will record them in 2001 in connection with
> restating its 2001 financial statements. In connection
> with the review described above, the Company has also
> determined that other adjustments should be made to its
> financial statements for 2001 and the first three
> quarters of 2002. The most significant of those
> adjustments are as follows:
>
> Impairment of Long-Lived Assets
>
> * The Company's prior policy regarding impairment of
> long-lived assets was to evaluate operating restaurant,
> bakery and café properties on a market basis. The
> Company has now determined that these assets should be
> evaluated on a site by site basis. As a result of this
> change, an impairment of long-lived assets of $4.5
> million to $5.5 million pre-tax will be recorded at
> year-end 2001, and an impairment charge of $11 million
> to $12 million pre-tax will be recorded at year-end
> 2002. Because the book value of the subject assets will
> be reduced, related depreciation expense will decrease
> in future years.

Franchising Matters

* When the Company has sold assets to a franchisee in connection with the conversion of Company-owned units, it has recorded a gain on the assets at the time of the conversion. The Company has determined that it should defer a portion of the gain on some assets sold where the Company maintains involvement with the assets, such as where it continues to lease property to the franchisee. Adjustments will be recorded in 2001 and in the first three quarters of 2002 to defer gains previously recognized on sales of assets to franchisees in these circumstances.

* The Company maintains cooperative advertising funds that receive contributions separately from Popeyes and Church's franchisees, with amounts contributed to those funds by franchisees and the Company being used throughout the year for advertising for the respective brands. The Company historically has not consolidated these funds in its financial statements, but the Company now has determined that it is necessary to do so. The Company expects that the consolidation will result in additional advertising expenses of $1.0 million to $2.0 million pre-tax during 2001.

Seattle Coffee Company

* As previously reported, the Company recorded an adjustment in the third quarter of 2002 at its Seattle Coffee Company subsidiary to reflect the write down of inventory to net realizable value. The write down was due to a correction of errors relating to inventory costing changes, inventory obsolescence issues, package design changes, and a non- integrated inventory accounting system. The Company has determined that this write down should have been recorded in 2001 and therefore will record an adjustment of $2.0 million to $2.4 million pre-tax in 2001 related to this item.

* Slotting fees payable to grocery retailers for placing Seattle Coffee Company coffee in their stores were previously amortized over a two- year period. The Company has determined that certain of these amounts should have been recognized as sales discounts and therefore netted against sales in the period incurred. An adjustment of $1.0 million to $1.5 million pre-tax will be recorded at Seattle Coffee Company during 2001 to reflect this change.

* An adjustment of $700,000 to $1.0 million pre-tax in 2001 will be recorded at Seattle Coffee Company to reflect sales allowances, adjustments and returns that were recorded in incorrect periods.

Other

* The Company has determined that rent that escalates over time should have been recognized on a straight-line basis over the entire term of the lease, including renewal options, rather over the initial term of the lease. It may be necessary to record adjustments in 2001 and in the first three quarters of 2002 as a result of this change.

* The Company previously was expensing payments to a former officer (under the terms of a previously disclosed employment agreement) as the payments are made over a ten-year term. The Company has determined that the entire obligation related to the agreement should have been recorded in 2001 when the agreement was signed. An adjustment of $2.5 million to $3.0 million pre-tax will be recorded in 2001 to recognize the present value of payments to be made to the former officer under the terms of this employment agreement.

* The Company's restated 2002 and 2001 financial statements will also include additional adjustments, none of which is individually expected to be as significant as the adjustments described above.

14

> In addition, the Company is continuing to assess
> whether it will be necessary to restate its fiscal year
> 2000 financial statements to reflect adjustments
> relating primarily to the items described above. When
> it completes this assessment, the Company will make a
> further announcement.

23. In response to this negative announcement, the price of AFC common stock dropped precipitously falling to as low as $12.30 per share, on extremely heavy trading volume.

## Materially False And Misleading
## Statements Issued During The Class Period

24. The Class Period begins on March 2, 2001. On that date, AFC commenced the initial public offering of its common stock (the "IPO") selling more than 9 million shares of AFC common stock for $17.00 per share. In connection with the IPO, the Company filed a registration statement, which incorporated a prospectus (the "Prospectus"), with the SEC, which contained financial information concerning the Company.

25. On May 21, 2001, AFC issued a press release announcing its financial results for its first fiscal quarter of 2001, the period ending April 22, 2001. The Company reported earnings of $0.27 per share. Defendant Belatti commented on the results stating in pertinent part as follows:

15

> We are pleased that in our first quarter as a public
> company we were able to achieve substantial growth. . .
> Our 57 percent increase in net income from continuing
> operations and the notable increase in operating EBITDA
> margins are a direct result of our ongoing franchising
> and brand building efforts.  The record financial
> results for the first quarter of 2001 demonstrate the
> direct benefits received by our shareholders as we
> execute our strategic plan.

26.  Also on May 21, 2001, AFC filed its Form10-Q for the

quarter ending April 22, 2001, with the SEC which was signed by

Defendant Wilkins.  The Form 10-Q repeated the financial results

previously announced and represented that:

> The accompanying condensed financial statements . . .
> in the opinion of management contain all adjustments
> (which are of a normal recurring nature) necessary for
> a fair presentation of the Company's financial
> condition and results of operations for the interim
> periods presented.

27.  On August 14, 2001, AFC issued a press release

announcing its financial results for the second fiscal quarter of

2001, the period ending July 15, 2001.  The Company reported

earnings of $0.28 per share for the quarter.  Defendant Belatti

commented on the results stating in pertinent part as follows:

> We are extremely pleased to report AFC's results for
> the second quarter of 2001. On a comparable quarterly
> basis, both system sales and our operating margins
> reflect record level performance. This performance is
> consistent with our expectations and demonstrates AFC's

16

ability to execute on its strategy of becoming the
Franchisor of Choice®). . . .

28.  On or about August 14, 2001, AFC filed its Form 10-Q

for the quarter ending July 15, 2001, with the SEC which was

signed by Defendant Wilkins.  The Form 10-Q repeated the

financial results previously announced and represented that:

> The accompanying condensed financial statements . . .
> in the opinion of management contain all adjustments
> (which are of a normal recurring nature) necessary for
> a fair presentation of the Company's financial
> condition and results of operations for the interim
> periods presented.

29.  On November 13, 2001, AFC issued a press release

announcing its financial results for the third fiscal quarter of

2001, the period ending October 7, 2001.  The Company reported

earnings of $0.29 per share for the quarter.  Defendant Belatti

commented on the results stating in pertinent part as follows:

> I'm pleased to report on another quarter of exceptional
> performance. . . AFC continues to demonstrate its
> ability to consistently deliver positive results ...
> including its stated goal of 25 percent or greater EPS
> growth. Our ability to deliver on our EPS growth rate
> target is a function of how well we've executed our
> strategic business model -- including franchising, our
> conversion strategy and the move to model markets and
> wholesaling. This quarter our Popeyes and Church's
> brands led the way in posting 5.5 and 4.2 percent
> increases in comparable sales.

Defendant Wilkins also commented on the results stating in

pertinent part as follows:

> We've developed an attractive, profitable business
> model for our investors, our franchise partners and for
> AFC,. . . As the company generates more revenue from
> franchise and wholesale related operations, we will
> continue to experience increases in our earnings per
> share due to the higher profit margins associated with
> these lines of business. We'll also have reduced
> capital requirements due to the company's conversion
> strategy. Additionally our franchise partners continue
> to earn attractive cash on cash returns on their
> investment as AFC executes its Franchisor of Choice®)
> strategy.

30.   That same day, AFC issued a press release announcing

that it was filing a registration statement with the SEC for the

sale of 7,000,000 shares of AFC common stock.  According to the

press release, the stock was to be sold by "Freeman Spogli & Co.,

PENMAN Private Equity and Mezzanine Fund, L.P. and certain AFC

officers," among others.  Subsequently, on December 6, 2001, AFC

issued a press release announcing that it had priced the public

offering of 7,000,000 at $23 per share.

31.   On November 13, 2001, AFC filed its Form 10-Q for the

quarter ending October 7, 2001, with the SEC which was signed by

defendant Wilkins.  The Form 10-Q repeated the financial results

previously announced and represented that:

18

> The accompanying condensed financial statements . . .
> in the opinion of management contain all adjustments
> (which are of a normal recurring nature) necessary for
> a fair presentation of the Company's financial
> condition and results of operations for the interim
> periods presented.

32.   On February 20, 2002, AFC issued a press release

announcing its financial results for the fourth fiscal quarter of

2001 and fiscal year 2001, the periods ending December 30, 2001.

The Company reported earnings of $0.37 per share for the quarter

and earnings of $1.21 per share for the fiscal year 2001.

Defendant Belatti commented on the results stating in pertinent

part as follows:

> AFC reached a number of milestones this year and we are
> extremely proud of these accomplishments. We delivered
> on our promise of a 25 percent diluted EPS growth rate.
> We successfully completed both an IPO and a secondary
> offering. We also opened 429 new restaurants, bakeries,
> and cafes system- wide, more than in any single year of
> our history, had record franchise revenues, a record
> 18.4 percent operating EBITDA margin and achieved a
> record 5.5 percent net income margin from continuing
> operations. We look forward to the coming year as we
> continue to build on the exceptionally solid foundation
> we've established. . . .

33.   On February 20, 2002, AFC filed its Form 10-K for

fiscal year 2001 with the SEC which was signed by Defendants

Wilkins and Belatti, among others.  The Form 10-K confirmed the previously announced financial results.

34.  On April 19, 2002, AFC issued a press release announcing that it was changing independent auditors from Arthur Andersen to KPMG LLP.

35.  On April 25, 2002, AFC issued a press release announcing that it had received a commitment on a new credit facility and that it had filed a shelf registration statement for the sale of more than 8 million shares of AFC common stock by Freeman Spogli & Co. and PENMAN Private Equity and Mezzanine Fund.

36.  On May 24, 2002, AFC issued a press release announcing its financial results for its first fiscal quarter of 2002, the period ending April 21, 2002.  The Company reported earnings of $0.40 per share.  Defendant Belatti commented on the results stating in pertinent part as follows:

> We had a very solid quarter. All of our growth drivers
> -- system-wide sales, comparable sales, franchise
> revenues, wholesale revenues, and our EBITDA margin,
> showed improved results versus the first quarter 2001.
> We are confident that we can continue to improve upon
> these key drivers and that we will meet the analyst
> consensus EPS estimate of $1.72 EPS from continuing
> operations for fiscal year 2002.

37. On May 28, 2002, AFC filed its Form10-Q for the quarter

ending April 21, 2002, with the SEC which was signed by Defendant

Wilkins.   The Form 10-Q repeated the financial results previously

announced and represented that:

> The accompanying condensed financial statements . . .
> in the opinion of management contain all adjustments
> (which are of a normal recurring nature) necessary for
> a fair presentation of the Company's financial
> condition and results of operations for the interim
> periods presented.

38. On August 13, 2002, AFC issued a press release

announcing its financial results for the second fiscal quarter of

2002, the period ending July 14, 2002.   The Company reported

earnings of $0.40 per share for the quarter.   Defendant Belatti

commented on the results stating in pertinent part as follows:

> We are extremely proud of our second quarter results.
> AFC's earnings remain solid as evidenced by our 42.9
> percent growth rate driven by our 24.7 percent increase
> in franchise revenues and overall improvement in our
> EBITDA margin. We continue to demonstrate that we are a
> sound investment, consistently delivering strong
> results in a time of broader market uncertainty. The
> AFC business model is easy to understand, has
> straightforward measurements to evaluate execution and
> provides AFC a strong platform for future growth

39. On August 14, 2002, AFC filed its Form10-Q for the

quarter ending July 14, 2002, with the SEC which was signed by

Defendant Wilkins.  The Form 10-Q repeated the financial results

previously announced and represented that:

> The accompanying condensed financial statements . . .
> in the opinion of management contain all adjustments
> (which are of a normal recurring nature) necessary for
> a fair presentation of the Company's financial
> condition and results of operations for the interim
> periods presented.

 40.  On November 5, 2002, AFC issued a press release

announcing that it would be delaying the release of its third

fiscal quarter results:

> pending the final determination of certain adjustments
> to be recorded in the third quarter 2002 or prior
> periods. The adjustments are limited to the Seattle
> Coffee Company and relate to a write-down of its
> inventory and an impairment of its leasehold
> improvements at its former headquarters in Seattle. The
> total amount is expected to range from $1.2 million to
> $2.1 million after tax.

Defendant Belatti commented on the announcement stating in

pertinent part as follows:

> In the spirit of full disclosure and absolute
> transparency, we want to be completely certain that
> these adjustments are recorded appropriately. With that
> said, we remain focused on our business and sharing our
> future plans with our investors at the upcoming
> conference which will be webcast live on Thursday
> morning, November 7, 2002.

41.   On November 12, 2002, AFC issued a press release announcing its financial results for the third fiscal quarter of 2002, the period ending October 6, 2002.  The Company reported earnings of $0.34 per share for the quarter.  Defendant Belatti commented on the results stating in pertinent part as follows:

> AFC's earnings per share growth rate, strong cash flow generation, EBITDA margin improvement, and new unit openings by our franchise partners demonstrate the continued success of our business model.

> We expect ongoing improvement in these key areas, but also anticipate near term softness in comparable store sales, with flat comps on a blended basis through the remainder of this year, then turning positive in 2003

42.   On November 19, 2002, AFC filed its Form10-Q for the quarter ending October 6, 2002, with the SEC which was signed by Defendant Wilkins.  The Form 10-Q repeated the financial results previously announced and represented that:

> The accompanying condensed financial statements . . . in the opinion of management contain all adjustments (which are of a normal recurring nature) necessary for a fair presentation of the Company's financial condition and results of operations for the interim periods presented.

43.   On January 16, 2003, AFC issued a press release announcing its update for the fourth quarter of 2002 and fiscal year 2002.  The press release provided certain information

23

concerning the operating performance of AFC.  Defendant Bellati
commented on the results stating in pertinent part as follows:

> Despite a tough business environment, AFC had a record
> number of new unit openings and commitments for the
> fourth quarter, which in addition to comparable store
> sales, are key drivers to our business and earnings
> model. We continue to focus on these key areas,
> including placing a heightened emphasis on improving
> comparable sales performance in 2003 by insisting on
> operational excellence, productivity improvements and
> new product innovation

44.  The statements referenced above in paragraphs 24-29,
31-33 and 36-43 were each materially false and misleading when
made as they failed to disclose and misrepresented the following
material adverse facts that were then known to Defendants or
recklessly disregarded by them:

(a)  that the Company was improperly accounting for the
value of certain long-lived assets, thereby artificially
inflating its operating results;

(b)  that the Company was improperly accounting for the
sale of corporate-owned stores to franchisees, thereby
artificially inflating its operating results;

c)  that the Company was improperly accounting for
cooperative advertising costs, thereby understating its

24

advertising expenses and artificially inflating its operating
results;

(d)   that the Company's Seattle Coffee Company was
improperly accounting for inventory, sales allowances and
slotting fees; and

(e)   that as a result of the foregoing, the Company's
financial statements published during the Class Period were not
prepared in accordance with Generally Accepted Accounting
Principles and, therefore, it was not true that the Company's
financial statements were a "fair presentation" of the Company's
financial position.   Indeed, by announcing its intention to
restate its financial statements, AFC has admitted that its prior
financial statements were materially false and misleading when
issued.

## The Truth Begins To Emerge

45.   On March 24, 2003, after the close of the market, AFC
shocked the market by announcing that it would be restating its
financial statements for fiscal year 2001 and the first three
quarters of 2002.   The Company also reported that it was
examining whether or not its financial statements for fiscal year

2000 should be restated.   The press release stated in pertinent

part as follows:

> On January 16, 2003, the Company announced plans to
> record an impairment charge related to the carrying
> value of certain long-lived assets at its restaurants,
> bakeries and cafes and other non-cash charges,
> including charges related to fixed asset and leasehold
> improvement write-offs. The Company originally intended
> to record these charges in the fourth quarter of 2002,
> but now will record them in 2001 in connection with
> restating its 2001 financial statements. In connection
> with the review described above, the Company has also
> determined that other adjustments should be made to its
> financial statements for 2001 and the first three
> quarters of 2002. The most significant of those
> adjustments are as follows:
>
> Impairment of Long-Lived Assets
>
> * The Company's prior policy regarding impairment of
> long-lived assets was to evaluate operating restaurant,
> bakery and café properties on a market basis. The
> Company has now determined that these assets should be
> evaluated on a site by site basis. As a result of this
> change, an impairment of long-lived assets of $4.5
> million to $5.5 million pre-tax will be recorded at
> year-end 2001, and an impairment charge of $11 million
> to $12 million pre-tax will be recorded at year-end
> 2002. Because the book value of the subject assets will
> be reduced, related depreciation expense will decrease
> in future years.
>
> Franchising Matters
>
> * When the Company has sold assets to a franchisee in
> connection with the conversion of Company-owned units,
> it has recorded a gain on the assets at the time of the
> conversion. The Company has determined that it should

26

defer a portion of the gain on some assets sold where
the Company maintains involvement with the assets, such
as where it continues to lease property to the
franchisee. Adjustments will be recorded in 2001 and in
the first three quarters of 2002 to defer gains
previously recognized on sales of assets to franchisees
in these circumstances.

* The Company maintains cooperative advertising funds
that receive contributions separately from Popeyes and
Church's franchisees, with amounts contributed to those
funds by franchisees and the Company being used
throughout the year for advertising for the respective
brands. The Company historically has not consolidated
these funds in its financial statements, but the
Company now has determined that it is necessary to do
so. The Company expects that the consolidation will
result in additional advertising expenses of $1.0
million to $2.0 million pre-tax during 2001.

Seattle Coffee Company

* As previously reported, the Company recorded an
adjustment in the third quarter of 2002 at its Seattle
Coffee Company subsidiary to reflect the write down of
inventory to net realizable value. The write down was
due to a correction of errors relating to inventory
costing changes, inventory obsolescence issues, package
design changes, and a non- integrated inventory
accounting system. The Company has determined that this
write down should have been recorded in 2001 and
therefore will record an adjustment of $2.0 million to
$2.4 million pre-tax in 2001 related to this item.

* Slotting fees payable to grocery retailers for
placing Seattle Coffee Company coffee in their stores
were previously amortized over a two- year period. The
Company has determined that certain of these amounts
should have been recognized as sales discounts and
therefore netted against sales in the period incurred.

An adjustment of $1.0 million to $1.5 million pre-tax will be recorded at Seattle Coffee Company during 2001 to reflect this change.

* An adjustment of $700,000 to $1.0 million pre-tax in 2001 will be recorded at Seattle Coffee Company to reflect sales allowances, adjustments and returns that were recorded in incorrect periods.

Other

* The Company has determined that rent that escalates over time should have been recognized on a straight-line basis over the entire term of the lease, including renewal options, rather over the initial term of the lease. It may be necessary to record adjustments in 2001 and in the first three quarters of 2002 as a result of this change.

* The Company previously was expensing payments to a former officer (under the terms of a previously disclosed employment agreement) as the payments are made over a ten-year term. The Company has determined that the entire obligation related to the agreement should have been recorded in 2001 when the agreement was signed. An adjustment of $2.5 million to $3.0 million pre-tax will be recorded in 2001 to recognize the present value of payments to be made to the former officer under the terms of this employment agreement.

* The Company's restated 2002 and 2001 financial statements will also include additional adjustments, none of which is individually expected to be as significant as the adjustments described above.

In addition, the Company is continuing to assess whether it will be necessary to restate its fiscal year 2000 financial statements to reflect adjustments relating primarily to the items described above. When

28

it completes this assessment, the Company will make a
further announcement.

46.    In response to this negative announcement the price of

AFC common stock dropped precipitously falling to as low as

$12.30 per share, on extremely heavy trading volume.

47.    The market for AFC's common stock was open, well-

developed and efficient at all relevant times.  As a result of

these materially false and misleading statements and failures to

disclose, AFC's common stock traded at artificially inflated

prices during the Class Period.  Plaintiff and other members of

the Class purchased or otherwise acquired AFC common stock

relying upon the integrity of the market price of AFC's common

stock and market information relating to AFC, and have been

damaged thereby.

48.    During the Class Period, Defendants materially misled

the investing public, thereby inflating the price of AFC's common

stock, by publicly issuing false and misleading statements and

omitting to disclose material facts necessary to make Defendants'

statements, as set forth herein, not false and misleading.  Said

statements and omissions were materially false and misleading in

that they failed to disclose material adverse information and

29

misrepresented the truth about the Company, its business and operations, as alleged herein.

49.  At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about AFC's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of AFC and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

30

## ADDITIONAL SCIENTER ALLEGATIONS

50. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding AFC, their control over, and/or receipt and/or modification of AFC's allegedly materially misleading misstatements and/or their associations with the Company, all of which made them privy to confidential proprietary information concerning AFC, participated in the fraudulent scheme alleged herein.

51. The Individual Defendants were further motivated to engage in the fraudulent scheme alleged herein in order to permit insider sales by them and other executives and directors of AFC.

During the Class Period, these sales were in the tens of millions of dollars.

### Applicability Of Presumption Of Reliance: Fraud-On-The-Market Doctrine

52.  At all relevant times, the market for AFC's common stock was an efficient market for the following reasons, among others:

(a)  AFC's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  As a regulated issuer, AFC filed periodic public reports with the SEC and the NASDAQ;

(c)  AFC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  AFC was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their

32

respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

53.  As a result of the foregoing, the market for AFC's common stock promptly digested current information regarding AFC from all publicly-available sources and reflected such information in AFC's stock price. Under these circumstances, all purchasers of AFC's common stock during the Class Period suffered similar injury through their purchase of AFC's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

54.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the

extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular statement identified as forward-looking was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AFC who knew that those statements were false when made.

### FIRST CLAIM
### Violation Of Section 10(b) Of
### The Exchange Act Against And Rule 10b-5
### Promulgated Thereunder Against All Defendants

55. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AFC's common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of

conduct, Defendants, and each of them, took the actions set forth herein.

57. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for AFC's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

58. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of AFC as specified herein.

59. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse

35

non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AFC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about AFC and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AFC common stock during the Class Period.

60. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections

36

and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public, which they knew or recklessly disregarded was materially false and misleading.

61.   The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or reck-lessly and for the purpose and effect of concealing AFC's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock.  As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, Defendants,

37

if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

62. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AFC's common stock was artificially inflated during the Class Period. In ignorance of the fact that market prices of AFC's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired AFC common stock during the Class Period at artificially high prices and were damaged thereby.

63. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their

38

falsity, and believed them to be true.  Had Plaintiff and the

other members of the Class and the marketplace known the truth

regarding the problems that AFC was experiencing, which were not

disclosed by Defendants, Plaintiff and other members of the Class

would not have purchased or otherwise acquired their AFC common

stock, or, if they had acquired such common stock during the

Class Period, they would not have done so at the artificially

inflated prices which they paid.

64.   By virtue of the foregoing, Defendants have violated

Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated

thereunder.

65.   As a direct and proximate result of Defendants'

wrongful conduct, Plaintiff and the other members of the Class

suffered damages in connection with their respective purchases

and sales of the Company's common stock during the Class Period.

## SECOND CLAIM
### Violation Of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

66.   Plaintiff repeats and realleges each and every

allegation contained above as if fully set forth herein.

67.   The Individual Defendants acted as controlling persons

of AFC within the meaning of Section 20(a) of the Exchange Act as

alleged herein.  By virtue of their high-level positions, and
their ownership and contractual rights, participation in and/or
awareness of the Company's operations and/or intimate knowledge
of the false financial statements filed by the Company with the
SEC and disseminated to the investing public, the Individual
Defendants had the power to influence and control and did
influence and control, directly or indirectly, the decision-
making of the Company, including the content and dissemination of
the various statements which Plaintiff contend are false and mis-
leading.  The Individual Defendants were provided with or had
unlimited access to copies of the Company's reports, press
releases, public filings and other statements alleged by
Plaintiff to be misleading prior to and/or shortly after these
statements were issued and had the ability to prevent the
issuance of the statements or cause the statements to be
corrected.

        68.  In particular, each of these Defendants had direct and
supervisory involvement in the day-to-day operations of the
Company and, therefore, is presumed to have had the power to
control or influence the particular transactions giving rise to

40

the securities violations as alleged herein, and exercised the same.

69.  As set forth above, AFC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Awarding such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff hereby demands a trial by jury.

Dated:        March 25, 2003

**HOLZER HOLZER & CANNON, LLC**

By: _Christi A Cannon_

Christi A. Cannon
Georgia Bar No. 107869
Michael I. Fistel, Jr.
Georgia Bar No. 262062
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338
(770) 392-0090

**CAULEY GELLER BOWMAN COATES & RUDMAN, LLP**
Samuel H. Rudman
200 Broadhollow Road
Suite 406
Melville, NY 11747
(631) 367-7100

42

**SCHIFFRIN & BARROWAY LLP**
Marc A. Topaz
Three Bala Plaza East
Suite 400
Bala Cynwyd, PA 19004
(610) 667-7706

**Attorneys for Plaintiff**

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, James Nugent, (Plaintiff) declares, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint and retains Schiffrin & Barroway, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's transactions in the AFC Enterprises, Inc. (Nasdaq: AFCE) security that is the subject of this action during the Class Period are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 400 | Bought | 8/30/01 | $22.73 |
| 400 | Sold | 6/13/02 | $30.91 |
| 300 | Bought | 12/12/01 | $25.00 |

List additional transactions on a separate sheet of paper, if necessary.

5.    During the three years prior to the date of this Certification, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws: N/A

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 25 day of MARCH , 2003.

JAMES NUGENT

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL

# United States District Court

__Northern__ ————————— **DISTRICT OF** ——— __Georgia__

James Nugent, Individually And
On Behalf of All others Similarly
Situated

**SUMMONS IN A CIVIL CASE**

V.

AFC Enterprises, Inc., Frank Belatti,
And Gerald J. Wilkins

**CASE NUMBER:**

## 1:03-CV-0817

TO: (Name and address of defendant)

Gerald J. Wilkins
c/o AFC Enterprises, Inc.
Six Concourse Parkway
Suite 1700
Atlanta, GA 30328

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Christi A. Cannon
Holzer Holzer & Cannon, LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

an answer to the complaint which is herewith served upon you, within _____ **20** _____ days after service of this
summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief
demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after
service.

__LUTHER D. THOMAS__
CLERK

DATE

_C.H. Leucher_

(BY) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

# ORIGINAL

# United States District Court

Northern _____ DISTRICT OF _____ Georgia

JAMES NUGENT, INDIVIDUALLY AND
ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED

### SUMMONS IN A CIVIL CASE

V.

AFC ENTERPRISES, INC., FRANK BELATTI,
AND GERALD J. WILKINS

CASE NUMBER:

**1:03-CV-0817**

TO: (Name and address of defendant)

AFC ENTERPRISES, INC.
SIX CONCOURSE PARKWAY
SUITE 1700
ATLANTA, GA 30328

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Christi A. Cannon
Holzer Holzer & Cannon, LLC
1117 Perimeter Center West
Suite E-107
Atlanta, GA 30338

an answer to the complaint which is herewith served upon you, within _____ **20** _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS
CLERK

MAR    2003

DATE

_Chleucher_
(BY) DEPUTY CLERK

AO 440 (Rev. 10/93) Summons in a Civil Action

ORIGINAL

# United States District Court

Northern _____ **DISTRICT OF** Georgia _____

JAmes Nugent, Individually And
on Behalf of All others Similarly
Situated

V.

AFC Enterprises, Inc., Frank Belatti,
And Gerald J. Wilkins

**SUMMONS IN A CIVIL CASE**

**CASE NUMBER:**

1:03-CV-0817

TO: (Name and address of defendant)

Frank Belatti
c/o AFC Enterprises, Inc.
Six Concourse Parkway
Suite 1700
Atlanta, GA 30328

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Christi A. Cannon
Holzer Holzer & Cannon, LLC
1117 Perimeter Center West
Suite E-102
Atlanta, GA 30338

an answer to the complaint which is herewith served upon you, within _____ **20** _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS _____
CLERK

MAR 2 5 2003
DATE

Chleecher _____
(BY) DEPUTY CLERK