

**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

JUL 1 9 2004

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

_____ )
)
IN RE AFC ENTERPRISES, INC.       )    Consolidated Civil Action
SECURITIES LITIGATION             )    NO. 1:03-CV-0817-WSD
                                  )
_____ )

# PLAINTIFFS' OMNIBUS REPONSE TO DEFENDANTS' MOTIONS TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**CHITWOOD & HARLEY, LLP**
Martin D. Chitwood
Edward H. Nicholson, Jr.
David J. Worley
Meryl W. Edelstein
Joseph P. Helm, III
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, Georgia 30309
Tel: (404) 873-3900
Fax: (404) 876-4476

**MILBERG WEISS BERSHAD & SCHULMAN, LLP**
Maya S. Saxena
Robert R. Adler
Joseph E. White, III
5355 Town Center Road
Suite 900
Boca Raton, Florida 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**LERACH COUGHLIN STOIA & ROBBINS, LLP**
William S. Lerach
Darren Robbins
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: (619) 231-1058
Fax: (619) 231-7423

**Co-Lead Counsel for Plaintiffs**

# TABLE OF CONTENTS

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

      A.   <u>Pleading Requirements Under the PSLRA</u> . . . . . . . . . . . . . . . 21

      B.   <u>Defendants' Accounting Manipulations Are Pled With the
           Requisite Particularity</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           1.   **Plaintiffs Have Provided Sufficient Detail
                Regarding the Improper Gains on Unit Conversions** . . . . . . .30

           2.   **The Improper Capitalization of Slotting Fees is
                Sufficiently Detailed** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

           3.   **The Complaint Pleads the Company's Failure to
                Write Down Impaired Assets With the Requisite
                Particularity** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .34

           4.   **The Complaint Sufficiently Pleads the Company's
                Failure to Properly Account for Inventory
                Adjustments at Seattle Coffee** . . . . . . . . . . . . . . . . . . . . 36

           5.   **Plaintiffs Have Met the Particularity
                Requirement With Respect to All Other
                Accounting Manipulations**. . . . . . . . . . . . . . . . . . . . . . . . 37

      C.   <u>The Aggregation of Particularized Facts Establishes
           Defendants' Scienter</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

1.   Standard for Pleading Scienter . . . . . . . . . . . . . . . . . . . . . . . 38

2.   Violations of GAAP as Evidenced by the
     Massive Restatement, Combined With Other
     Circumstances Indicative of Fraud, Support
     a Strong Inference of Scienter . . . . . . . . . . . . . . . . . . . . . . . 42

3.   Defendants' Motive and Opportunity to Commit
     Securities Fraud Factors Into the Scienter Equation . . . . . . .51

     a.   The Massive Insider Trading Demonstrates Scienter . 52

          1.   Defendants' Sales Were Unusual in Timing. . . . 53

          2.   The Amount of Stock Defendants Sold
               Was Suspicious . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

     b.   Executive Compensation . . . . . . . . . . . . . . . . . .. . . . . 58

     c.   Meeting Analysts' Estimates . . . . . . . . . . . . . . . . . . . 62

4.   Defendants' Positions Within the Company Accompanied
     by Their Receipt of Internal Reports and Attendance at
     Meetings Evidences Their Scienter . . . . . . . . . . . . . . . . . . . . 63

5.   Plaintiffs Have Sufficiently Established Scienter as to
     Each of the Individual Defendants . . . . . . . . . . . . . . . . . . . . 67

     a.   Frank Belatti . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

     b.   Gerald Wilkins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .70

     c.   Dick Holbrook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

     d.   Kelvin Pennington . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**D.**     **The Complaint Adequately Alleges Liability under Section 20(A) for Contemporaneous Trading** . . . . . . . . . . . . . . . 78

**E.**     **Plaintiffs Have Shown that Liability Under Section 11 Has Been Established as to All Defendants** . . . . . . . . . . . . . . . . . . . 80

     **1.**     **The Securities Act is Intended to Protect Investors Through Strict Liability** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

     **2.**     **This Court Should Not Adopt the "Sound in Fraud" Framework Proposed by Defendants, Nor Should it Apply Rule 9(b) to the Securities Act Claims** . . . . . . . . . . . . .81

     **3.**     **Even if this Court Does Adopt the "Sound in Fraud" Test, Plaintiffs' Securities Act Claims Are Not Based on Fraud, and Therefore Should Not be Dismissed** . . . . . . . .86

     **4.**     **Plaintiffs Have Standing to Assert a Section 11 Claim** . . . . . . 90

     **5.**     **Plaintiffs Have Properly Asserted Securities Act Claims Against Defendants Frankel and Farrar** . . . . . . . . . . 93

         **a.**     **Defendant Farrar** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

         **b.**     **Defendant Frankel** . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**F.**     **The Complaint Sufficiently Pleads Control Person Liability Under Both Sections 15 and 20(a)** . . . . . . . . . . . . . . . 97

iii

1.    The Standard in the Eleventh Circuit . . . . . . . . . . . . . . . . . . 97

2.    The Complaint Adequately Alleges Control Person
      Claims Against the Individual Defendants . . . . . . . .. . . . . . .97

3.    The Complaint Adequately Alleges Control Person
      Claims Against Defendant Frankel . . . . . . . . . . . . . . . . . . .98

4.    The Complaint Adequately Alleges Control Person
      Claims Against Defendants Freeman Spogli and Penman . .100

5.    The Complaint Adequately Alleges Control Person
      Claims Against the Outside Director Defendants . . . . . . . . .102

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

# **TABLE OF AUTHORITIES**

<u>Cases</u>

1.   Abrams v. Baker Hughes, Inc., 292 F. 3d 424 (5th Cir. 2002) . . . . . . . . . . 58

2.   Acito v. IMCERA Group, Inc., 47 F.3d 47 (2nd Cir. 1995) . . . . . . . . . . . . 59

3.   In re Adaptive Broadband Sec. Litig., No. C 01-1092 SC,
     2002 WL 989478 (N.D. Cal. Apr. 2, 2002) . . . . . . . . . . . . . . . . . . . . . . . . .46

4.   In re Aetna, Inc. Sec. Litig., 34 F. Supp.2d 935 (E.D. Pa. 1999)  . . . . . 26, 29

5.   Affiliated Ute Citizens v. United States, 406 U.S. 128 (1972) . . . . . . . . . . 80

6.   Aldridge v. A.T. Cross Corp., 284 F.3d 72 (1st Cir. 2002) . . . . . . . . . . 61, 64

7.   Allison v. Brooktree Corp., 999 F. Supp. 1342 (S.D. Cal. 1998)  . . . . . . . .56

8.   Alpern v. Utilicorp United, Inc., 84 F.3d 1525 (8th Cir. 1996) . . . . . . . . . .91

9.   In re Ancor Communications, Inc., 22 F. Supp.2d 999 (D. Minn. 1998) . . 45

10.  Anderson v. Transglobe Energy Corp., 35 F. Supp.2d 1363
     (M.D. Fla. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

11.  In re Anicom, Inc. Sec. Litig., No. 00 4391, 2001 WL 536066
     (N.D. Ill. May 18, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

12.  In re Ashworth, Inc. Sec. Litig., No. 99CV0121-L(JAH), 2000 WL
     33176041 (S.D. Cal. Jul. 18, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .28

13.  In re Baan Co. Sec. Litig., 103 F. Supp.2d 1 (D.D.C. 2000) . . . . . . . . . . .29

14.  Basic, Inc. v. Levinson, 485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . .49, 81

15.  Beecher v. Able, 435 F. Supp. 397 (S.D.N.Y. 1975) . . . . . . . . . . . . . . . . .91

16.  In re Blockbuster Inc. Sec. Litig., No. 3:03-CV-0398-M,
     2004 WL 884308 (N.D. Tex. Apr. 26, 2004) . . . . . . . . . . . . . . . . . . . . . . 41

17.  Brown v. Enstar Group, Inc., 84 F.3d 393 (11th Cir. 1996) . . . . . . . . passim

18.   Bryant v. Avado Brands, Inc., 187 F.3d 1271 (11th Cir. 1999)  passim

19.   In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410
      (3rd Cir. 1997) . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . . . . . . . 24, 26

20.   In re Cabletron Systems, Inc., 311 F.3d 11 (1st Cir. 2002) . . . . . . . . . . . .51

21.   Carley Capital Group v. Deloitte & Touche, LLP,
      27 F. Supp.2d 1324 (N.D. Ga. 1998) . . . . . . . . . . . . . . . . . . . . . . passim

22.   In re Century Bus. Servs. Sec. Litig., No. 1:99CV02200, 2002 WL
      32254513 (N.D. Ohio June 27, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

23.   Chalverus v. Pegasystems, 59 F. Supp.2d 226
      (D. Mass. 1999) . . . . . . . . . . . . . . . . . . .  . . . . . . . . . . . . . . . 37, 45, 64

24.   Chu v. Sabratek Corp., 100 F. Supp.2d 815 (N.D. Ill. 2000) . . . . . . . . . . .32

25.   In re Clarus Corp. Sec. Litig., 201 F. Supp.2d 1244
      (N.D. Ga. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 64, 65

26.   Cohen v. Koenig, 25 F.3d 1168 (2nd Cir. 1994) . . . . . . . . . . . . . . . . . . .63

27.   In re Computer Assoc. Class Action Sec. Litig.,
      75 F. Supp.2d 68 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .32

28.   Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . .23, 39

29.   Cooper v. Pate, 378 U.S. 546 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . .23

30.   Cooper v. Pickett, 137 F.3d 616 (9th Cir. 1998) . . . .. . . . . . . . . . . . . . . .25

31.   Cosmas v. Hassett, 886 F.2d 8 (2nd Cir. 1989) . . . . . . . . . . . . . . . . .63, 65

32.   Crimi Mae, Inc. Sec. Litig., 94 F. Supp.2d 652 (D. Md. 2000) . . . . . . .. . 60

33.   In re Cryolife, Inc. Sec. Litig., No. 02-CV-1868 (BBM), slip op.
      (N.D. Ga. May 27, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29, 49

34.   In re Cylink Sec. Litig., 178 F. Supp.2d 1077 (N.D. Cal. 2001) . . . . . . . . 42

35.  In re Cypress Semiconductor Sec. Litig.,
     836 F. Supp. 711 (N.D. Cal. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .79

36.  In re Digi Int'l Inc. Sec. Litig., 6 F. Supp.2d 1089 (D. Minn. 1998) . . . . . . 60

37.  In re Discovery Zone Sec. Litig., 943 F. Supp. 924 (N.D. Ill. 1996). . . . . . 43

38.  In re Engineering Animation Sec. Litig.,
     110 F. Supp.2d 1183 (S.D. Iowa 2000) . . . . . .. . . . . . . . . . . . . . . . . . . 79

39.  In re Enron Corp. Securities, Deriviative & "ERISA Litigation", 258 F.
     Supp.2d 576 (S.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

40.  In re Envoy Corp. Sec. Litig., 133 F. Supp.2d 647
     (M.D. Tenn. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

41.  EP Medsystems, Inc. v. Ecocath, Inc., 235 F.3d 865 (3rd Cir. 2000) . . . . . 51

42.  In re E.Spire Communications, Inc. Sec. Litig.,
     127 F. Supp.2d 734 (D. Md. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

43.  Epstein v. Itron, Inc., 993 F. Supp. 1314 (E.D. Wash. 1998) . . . . . . . . . . . .64

44.  Ernst & Ernst v. Hochfelder, 425 U.S. 185 (1976) . . . . . . . . . . . . . . . . . .80

45.  Escott v. Barchris Constr. Corp., 283 F. Supp. 643
     (S.D.N.Y. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .95

46.  First Union Corp. Sec. Litig., 128 F. Supp.2d 871
     (W.D.N.C. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .27

47.  Fla. State Bd. of Admin. v. Green Tree Finan. Corp.,
     270 F.3d 645 (8th Cir. 2001) . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . .60, 61

48.  In re Global Crossing, Ltd. Sec. Litig.,
     313 F. Supp.2d 189 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . 32, 35, 50, 86

49.  Goldman v. Belden, 754 F.2d 1059 (2nd Cir. 1985) . . . . . . . . . . . . . . . . . 52

50. Griffin v. McNiff, 744 F. Supp. 1237 (S.D.N.Y. 1990),
    affirmed, 996 F.2d 303 (2nd Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . .52

51. Gross v. Medaphis Corp., 977 F. Supp. 1463
    (N.D. Ga. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24, 25, 43, 45

52. Grossman v. Waste Management, 589 F. Supp. 395
    (N.D. Ill. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

53. In re Hamilton Bankcorp, Inc. Sec. Litig.,
    194 F. Supp.2d 1353 (S.D. Fla. 2002) . . . . . . . . . . . . . . . . . .33, 35, 50, 86

54. Harlowe v. Fitzgerald, 457 U.S. 800 (1982) . . . . . . . . . . . . . . . . . . . . .39

55. In re Hayes Lemmerz Int'l, Inc. Equity Sec. Litig.,
    271 F. Supp.2d 1007 (E.D. Mich. 2003). . . . . . . . . . . . . . . . . . . . . . . 46

56. Head v. NetManage, No. C-97-4386-CRB, 1998 WL 917794 (N.D. Cal.
    Dec. 30, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

57. Helwig v. Vencor, Inc., 251 F.3d 540 (6th Cir. 2001) . . . . . . . . . . . . . . .39

58. Herman & MacLean v. Huddleston, 459 U.S. 375 (1983) . . . . . . . .80, 81, 82

59. Howard v. Everex Systems, Inc., 228 F.3d 1057 (9th Cir. 2000) . . . . . . . .51

60. In re Indep. Energy Holdings PLC Sec. Litig.,
    154 F. Supp.2d 741 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 103

61. In re Ins. Mgmt. Solutions Group Sec. Litig., No. 8:00CV203T26MAP,
    2001 WL 34106903 (M.D. Fla. July 11, 2001) . . . . . . . . . . . . . . . . . . 81

62. In re IPO Sec. Litig., 241 F. Supp.2d 281 (S.D.N.Y. 2003) . . . . . . . . .84, 85

63. Itoba Ltd. v. LEP Group PLC, 32 F. Supp.2d 516 (D. Conn. 1999) . . . . . . 54

64. In re JDN Realty Corp. Sec. Litig.,
    182 F. Supp.2d 1230 (N.D. Ga. 2002) . . . . . . . . . . . . . . . . . . .23, 24, 29, 97

65. In re JWP Inc. Sec. Litig., 928 F. Supp. 1239 (S.D.N.Y. 1996). . . . . . . . . 77

66. Kilpatrick v. J.C. Bradford & Co., 827 F.2d 718 (11th Cir. 1987) . . . . . . . 82

67. In re K-Tel Int'l, Inc. Sec. Litig., 300 F.3d 881 (8th Cir. 2002) . . . . . . . . . .51

68. Lewis v. Advanced Technical Products, Inc.,
    No. 1:00-CV-1702-WBH, slip op. (N.D. Ga. Aug. 28, 2001) . . . . . . . . . 29

69. Lilley v. Charren, 936 F. Supp. 708 (C.D. Cal. 1996) . . . . . . . . . . . . . . 100

70. Lone Star Ladies Inv. Club v. Schlotzsky's, Inc., 238 F.3d 363
    (5th Cir. 2001) . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . 88

71. Lopez v. First Union Nat'l Bank, 129 F.3d 1186 (11th Cir. 1997) . . . . . . . .23

72. Malone v. Microdyne Corp., 26 F.3d 471 (4th Cir. 1994) . . . . . . . . . . . . .43

73. In re Marksman Partners, L.P. v. Chantal Pharmaceutical Corp.,
    927 F. Supp. 1297 (C.D. Cal. 1996) . . . . . . . . . . . . . . . . . . . . . . . 26, 57, 60

74. Martino-Catt v. E.I. duPont de Nemours and Co., 213 F.R.D. 308
    (S.D. Iowa 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

75. In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp.2d 1248
    (N.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

76. In re Merchants Acceptance Corp. Sec. Litig., No. 97 C 2715,
    1998 WL 781118 (N.D. Ill. Nov. 4, 1998) . . . . . . . . . . . . . . . . . . . . . . . . 32

77. Merzin v. Provident Fin. Group, Inc., 311 F. Supp.2d 674
    (S.D. Ohio 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

78. In re Microstrategy, Inc. Sec. Litig., 115 F. Supp.2d 620
    (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46

79. In re Miller Industries, Inc. Sec. Litig., 12 F. Supp.2d 1323
    (N.D. Ga. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . passim

80. In re Mirant Corp. Sec. Litig., No. 1:02-CV-1467-BBM, slip op.
    (N.D. Ga. Jul. 14, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . .49

81.  Novak v. Kasaks, 216 F.3d 300 (2nd Cir. 2000) . . . . . . . . . . . . . . 45, 51, 58

82.  Ottmann v. Hanger Orthopedic Group, Inc., 353 F.3d 338
     (4th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

83.  In re Oxford Health Plans, Inc., 187 F.R.D. 133 (S.D.N.Y. 1999) . 29, 54, 79

84.  In re Party City Sec. Litig., 147 F. Supp.2d 282 (D. N.J. 2001) . . . . . . . . . .54

85.  Pharo v. Smith, 621 F.2d 656 (5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . .97

86.  Phillips v. LCI Int'l, Inc., 190 F.3d 609 (4th Cir. 1999) . . . . . . . . . . . . . . . .60

87.  Phillips v. Scientific-Atlanta, Inc., No. 03-13008, 2004 WL 1382906
     (11th Cir. Jun. 22, 2004) (Scientific-Atlanta II) . . . . . . . . . . . . . . . 29, 40, 41

88.  Pirraglia v. Novell, Inc., 339 F.3d 1182 (10th Cir. 2003) . . . . . . . . . . . . .51

89.  In re Polaroid Sec. Litig., 134 F. Supp.2d 176 (D. Mass. 2001) . . . . . . . .37

90.  PR Diamonds, Inc. v. Chandler, 364 F.3d 671 (6th Cir. 2004) . . . . . . . 47, 51

91.  In re Premiere Technologies, Inc. Sec. Litig.,
     No. 1:98-CV-1804-JOF, 2000 WL 33231639
     (N.D. Ga. Dec. 8, 2000) (Premiere Tech. II) . . . . . . . . . . . . . . 26, 31, 33, 42

92.  In re Premiere Technologies, Inc. Sec. Litig.,
     No. 1:98-CV-1804-JOF, slip op. (N.D. Ga. 1999)
     (Premiere Tech. I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 81, 88

93.  Press v. Chemical Inv. Servs. Corp., 166 F.3d 529 (2nd Cir. 1999) . . . . . . 39

94.  In re Raytheon Sec. Litig., 157 F. Supp.2d 131 (D. Mass. 2001) . . . . . . . . 29

95.  Reiger v. Price Waterhouse Coopers, LLP, 117 F. Supp.2d 1003
     (S.D. Cal. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

96.  In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192 (SHS), 2001 WL 293820
     (S.D.N.Y. Mar. 27, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

97.   In re Ribozyme Pharm. Inc. Sec. Litig., 119 F. Supp.2d 1156
      (D. Colo. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 29

98.   Rombach v. Chang, 355 F.3d 164 (2d Cir. 2004) . . . . . . . . . . . . . . . . . .85

99.   Rosen v. Textron, Inc., Nos. 02-190S, 02-264S, 2004 WL 1344843
      (D. R.I. June 15, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

100.  Rubenstein v. Collins, 20 F.3d 160 (3rd Cir. 1994) . . . . . . . . . . . . . . . . 58

101.  Scheuer v. Rhodes, 416 U.S. 232 (1974), overruled on other grounds,
      Harlow v. Fitzgerald, 457 U.S. 800 (1982) . . . . . .. . . . . . . . . . . . . . .39

102.  In re Scientific-Atlanta, Inc. Sec. Litig., 239 F. Supp.2d 1351
      (N.D. Ga. 2002) (Scientific-Atlanta I) . . . . . . . . . . . . . . . . . . . .22, 38, 42, 54

103.  Schartz v. Celestial Seasonings, Inc., 124 F.3d 1246 (10th Cir. 1997) . . . . 29

104.  Sears v. Likens, 912 F.2d 889 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . .82

105.  In re Secure Computing Sec. Litig., 184 F. Supp.2d 980 (N.D. Cal. 2001)  55

106.  SEC v. Adler, 137 F.3d 1325 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . .52

107.  SEC v. Sys. Software Assocs., Inc., 145 F. Supp.2d 954 (N.D. Ill. 2001) .25

108.  In re Serologicals Sec. Litig., No. 1:00-CV-1025-CAP, slip op.
      (N.D. Ga. Feb. 20, 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

109.  Shapiro v. Merrill, Lynch, Fenner & Smith, 495 F.2d 228 (2d Cir. 1974) . 80

110.  Shapiro v. UJB Financial Corp., 964 F.2d 272 (3rd Cir. 1992) . . . . . . . . . .83

111.  Shaw v. Digital Equipment Corp., 82 F.3d 1194 (1st Cir. 1996) . . . . . . . . 25

112.  Shields v. Citytrust Bancorp, Inc. 25 F.3d 1124 (2nd Cir. 1994) . . . . . . . .59

113.  In re Smartalk Teleservices, Inc. Sec. Litig., 24 F. Supp.2d 527
      (S.D. Ohio 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 46

114.  Southland Securities Corp. v. INSpire Ins. Solutions, Inc,

365 F.3d 353 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .42, 51

115. In re Splash Tech. Holdings, Inc. Sec. Litig., No. C99-00109, 2000 WL
1727405 (N.D. Cal. Sept. 29, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .100

116. In re Stac Elec., 89 F.3d 1405 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 83

117. Stevelman v. Alias Research, Inc., 174 F3d 79
(2nd Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52, 55, 77

118. STI Classic Fund v. Bollinger Indus. Inc., No. 3-96-CV-823-R, 1996 WL
885802 (N.D. Tex. Oct. 25, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

119. Switzenbaum v. Internet Securities Systems, Inc., No. 1:01-CV-2601-WBH,
slip op. (N.D. Ga. Apr. 13, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

120. Theoharous v. Fong, 256 F.3d 1219 (11th Cir. 2001) . . . . . . . . . . . . . . . 100

121. In re Theragenics, Inc. Sec. Litig., 105 F. Supp.2d 1342 (N.D. Ga. 2000)
(Theragenics I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24, 29, 38

122. In re Theragenics Corp. Sec. Litig., 137 F. Supp.2d 1339 (N.D. Ga. 2001)
(Theragenics II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .23, 49, 51

123. In re Towne Services, Inc. Sec. Litig., 184 F. Supp.2d 1308
(N.D. Ga. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

124. In re Unicapital Corp. Sec. Litig., 149 F. Supp.2d 1353
(M.D. Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 97

125. United States v. Pringle, 350 F.3d 1171 (11th Cir. 2003) . . . . . . . . . . . . . 79

126. In re ValuJet, Inc., 984 F. Supp. 1472 (N.D. Ga. 1997) . . . . . . . . . . . . .64, 104

127. Vess v. Ciba-Geigy Corp., 317 F.3d 1097 (9th Cir. 2003) . . . . . . . . . . . . .85

128. Wilson v. Bernstock, 195 F. Supp.2d 619 (D. N.J. 2002) . . . . . . . . . . . .59

129. Wilson v. Comtech Telecommunications Corp., 648 F.2d 88
(2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80

130.  In re World Access, Inc. Sec. Litig., 119 F. Supp2d 1348
      (N.D. Ga. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

131.  In re WorldCom, Inc. Sec. Litig., 294 F. Supp.2d 392 (S.D.N.Y. 2003) . . . 77

132.  In re WorldCom, Inc. Sec. Litig., 2004 U.S. Dist. Lexis 11696
      (S.D.N.Y. June 29, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .89

133.  In re Worlds of Wonder Sec. Litig., 35 F.3d 1407 (9th Cir. 1994),
      cert. denied, 516 U.S. 909 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

134.  Young v. Nationwide Ins. Co., 2 F. Supp.2d 914 (S.D. Tex. 1998). . . . . . .61

135.  Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir. 2001) . . . . . . . . . .35

136.  Zuckerman v. Smart Choice Automotive Group, Inc.,
      No. 99 CV 237 ORL 99A, 2000 U.S. Distr. LEXIS 13489
      (M.D. Fla. May 18, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .63

## Statutes

15 U.S.C. §§ 77a-77bbbb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .80

15 U.S.C. § 77k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .passim

15 U.S.C. §78u-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25, 39

17 C.F.R. § 210.4-01(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

17 C.F.R. § 230.405 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

## Articles

Brian Murray and Donald J. Wallace, You Shouldn't Be Required to
Plead More Than You Have to Prove, 53 Baylor L. Rev 783
(2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82, 83, 84

## I.    INTRODUCTION

In this action, AFC Enterprises, Inc. ("AFC" or the "Company") shareholders seek redress for tremendous losses suffered because AFC and other Defendants wholly misrepresented its stunning run of reported financial success during the Class Period (March 2, 2001 through March 24, 2003), never informing the public of AFC's accounting practices that simultaneously overstated revenues and understated expenses.  Only when its new auditor forced AFC to issue a massive restatement covering almost three years – from the time of its inception as a publicly traded company until the restatement – did AFC admit that it had engaged in a plethora of accounting machinations.  AFC's seemingly stunning financial performance was merely a myth – the restatement proved that AFC had actually failed to meet earnings expectations in six of seven quarters.  As discussed below, these accounting manipulations make Defendants liable under both the Securities Act and the Exchange Act, and the untrue statements in the Prospectus/Registration Statement make them strictly liable under the Securities Act. As a result, the respective motions to dismiss should be entirely denied.

## II.    FACTS

AFC is a publicly-traded company that, during the Class Period in this case, owned, operated, and franchised quick-service restaurants under the trade names Popeye's Chicken & Biscuits, Church's Chicken, Cinnabon, Seattle's Best Coffee,

and Torrefazione Italia Coffee. Of the roughly 4000 quick-service restaurants under AFC's purview during the Class Period, approximately 450 were AFC-owned, and the remainder were franchised.

In 1996, America's Favorite Chicken Company, which controlled and operated restaurants under the Church's and Popeye's brands, changed its name to AFC Enterprises, Inc. In that same year, the Company received substantial investment from Defendants Freeman Spogli & Co., a Los Angeles-based merchant-banking firm, and PENMAN Partners, a Chicago private investment entity. For 1997, AFC reported $8.8 million in net income, the first profit posted by AFC since its emergence from bankruptcy in 1992. AFC would continue to report steadily growing profits until the end of the Class Period. In 1998, AFC acquired Seattle Coffee Company and its Seattle's Best Coffee and Torrefazione Italia Coffee brands, as well Cinnabon International, Inc. AFC's portfolio substantially increased to more than 3100 restaurants, bakeries, and cafes worldwide.

AFC expanded from 1999 into 2001, and went public on March 2, 2001. The initial public offering of 9,375,000 shares of common stock began trading on the NASDAQ under the symbol "AFCE." Also in 2001, AFC made a secondary public offering of 7,000,000 shares of common stock.

During the Class Period, AFC and its officers consistently touted the

- 2 -

Company's sterling financial performance, dazzling shareholders with a seeming ability to always meet or slightly exceed Wall Street's quarterly earnings per share ("EPS") forecasts. AFC's robust appearance, however, was a mirage created by a complex scheme of accounting manipulations orchestrated by the Defendants. The scheme was comprised of numerous misapplications of accounting principles and subtle adjustments to various elements of AFC's financials, which, in the aggregate, had the effect of allowing AFC to report income that met the EPS guidance of Wall Street analysts. In truth, and as later disclosed in AFC's restatement of its reported financials for eleven full quarters in fiscal years 2000, 2001, and 2002, AFC's income was substantially lower than EPS estimates for every interim reporting period, with the exception of the first quarter of 2002 (which was actually significantly understated), as shown in the chart below:

| QUARTER | REPORTED EPS[1] | ANALYST CONSENSUS EPS | RESTATED EPS[2] | % BY WHICH FORECAST WAS MISSED |
|---|---|---|---|---|
| Q1 2001 | $0.27 | $0.26 | $0.13 | 50% |
| Q2 2001 | 0.28 | 0.27 | 0.18 | 33% |
| Q3 2001 | 0.29 | 0.28 | 0.19 | 32% |
| Q4 2001 | 0.37 | 0.36 | 0.03 | 92% |
| FY 2001 | 1.21 | 1.20 | 0.50 | 58% |
| Q1 2002 | 0.40 | 0.40 | 0.46 | -15% |
| Q2 2002 | 0.40 | 0.40 | 0.28 | 30% |

[1] Diluted EPS excluding losses from change in accounting principle and extraordinary losses on early extinguishment of debt.

- 3 -

| Q3 2002[2] | 0.39 | 0.39 | 0.31 | 21% |

Remarkably, the percentages by which income for these periods were overstated range from 21% to 92% with a fair degree of variation, and yet, the aggregate effect of purportedly innocent accounting errors caused AFC's reported EPS to meet Wall Street expectations with uncanny precision in every quarter.

Defendants' fraudulent accounting scheme came to an abrupt end on March 24, 2003, when AFC announced that it would restate its previous financials and expected it would miss the March 31, 2003 deadline for filing its 2002 Annual Report. On March 25, 2003, AFC's stock price dropped $3.70 or 21% on unusually high trading volume of over 9 million shares, closing at a new 52 week low of $13.40 per share, in contrast to AFC's average daily trading volume of 300,000 shares.

Defendants' fraudulent accounting scheme was ultimately acknowledged by AFC to have included no fewer than twenty-one improprieties in AFC's financial statements. As detailed in the Complaint, (¶¶ 152-210), AFC's financial results had been falsely presented because AFC had:

- improperly failed to defer gains associated with restaurant sales to franchisees;

---

[2] Q3 2002 Actual & Consensus EPS figures exclude charges for the write down of inventory and leasehold improvements at the Seattle Coffee Company division.

- improperly understated current expenses by various means (including improper deferral of expenses, improper capitalization of expenses and overstatement of depreciable asset lives, among others);

- failed to write down impaired assets;

- improperly overstated inventory;

- improperly understated accrued liabilities;

- improperly capitalized interest on completed construction projects;

- improperly accounted for rebates;

- improperly reduced certain lease expenses by first subtracting fictitious sublease rental income;

- failed to consolidate and include Popeye's and Church's advertising funds and expenses in AFC's financial statements; and

- failed to record accruals accurately.

During the Class Period, in which Defendants systematically misrepresented AFC's operating results to the investing public, AFC insiders sold more than 9.2 million shares of AFC stock at fraudulently inflated values, reaping proceeds of approximately $210 million. As detailed below, these stock sales were suspicious in timing and amount.

In sharp contrast to Defendant AFC Chairman and CEO Belatti's earlier public statements in AFC's 2001 Annual Report that AFC was founded "…with the radical notion of being trustworthy," and his subsequent representation during an August 13, 2002 conference call that he had "great confidence in the transparency of [AFC's]

...financial statements," the restatement announcement made it readily apparent that his and the other Defendants' (stock selling) actions spoke louder than their words.

Salomon Smith Barney analyst Mark Kalinowski called the restatement announcement a "bombshell" in a report to investors, and withdrew his 2003 earnings and target price until the restatements were clarified.  Similarly, Morgan Stanley Investment Manager Richard Glass stated during a March 24, 2003 conference call that: "[t]here has to be some accountability in the company and changes need to be made if management is at all ... interested in regaining any credibility in the financial community.  Because right now its got to be zero – or below zero."

Even AFC's own investment bankers – Defendant Credit Suisse First Boston Corporation — acknowledged the damage to AFC's credibility as a result of this unexpected disclosure.  On April 3, 2003, securities analysts John S. Glass and Jeffrey D. Farmer of Defendant Credit Suisse First Boston Corporation stated in a report on the Company that it would "...take a considerable amount of time before the company rebuilds shareholder credibility."

AFC employees responded to the "bombshell" no differently.  In an article appearing in the December 22, 2003 edition of *The Delaney Report*, titled *Fried*, it was reported that ". . . sources say that Frank [Belatti] now has lost credibility among the AFC troops."

- 6 -

The aftermath continued with Defendant Wilkins' sudden resignation from AFC on April 29, 2003. On April 30, 2003, the SEC commenced an inquiry into AFC, requesting production of documents and other information relating to AFC's restatement. The SEC is also investigating whether certain disclosures made by AFC complied with SEC regulations. AFC was delisted from NASDAQ on August 18, 2003, forced to trade on the "pink sheets."

Prior to AFC's IPO, AFC issued Defendants Freeman Spogli, PENMAN and Belatti 14 million shares, 1.6 million shares, and 2.2 million shares of AFC stock, respectively. These Defendants additionally received millions of dollars in long-term "loans" to pay the purchase price and/or the stock option exercise price that was collateralized by the stock issued. Such loans enabled them to purchase AFC stock at approximately $11 per share or lower[3] and also had provisions allowing them to repay the loans with Company stock in the IPO.

As detailed in the Complaint at ¶¶ 53-64, the Prospectuses issued by AFC for both its IPO and its Secondary Offering contained financial and other statements that were, by AFC's own admission, materially false and misleading as revealed by AFC's restatement of financial results for 1998, 1999, 2000, 2001 and the first three

---

[3] This was a considerable discount relative to the price of AFC's stock later issued in the IPO at $17.00 per share.

quarters of 2002. The inclusion of these materially misleading statements had the effect of inflating the value of AFC stock at the time it was offered and thereafter.

As detailed in the Complaint at ¶¶ 74-133, Defendants made a series of false and misleading statements regarding the operating results of AFC. Many of the statements took the form of misstated financials submitted in AFC's SEC filings as well as those presented in press releases. Not only were the numbers cooked so that AFC could represent that it was meeting or exceeding analyst expectations (as was later made clear by the massive restatement), Defendant Belatti audaciously contended that the Company was undervalued in a July 22, 2002 press release, based on AFC's seemingly solid track record:

> By almost any comparison, we believe AFC is a high performing, yet undervalued company. AFC has consistently demonstrated its ability to deliver strong sustainable earnings growth, driven by its solid business model and strategy.

¶ 103. As the restatement clearly showed, this statement and many others, as detailed in the Complaint at ¶¶ 74-133, were absolutely false.

AFC published the following table in its 8-K filed December 15, 2003, detailing the adjustments required to restate its previously issued financial statements for fiscal years 2000 and 2001 and the first three quarters of 2002:

RESTATEMENT OF FINANCIAL STATEMENTS

The following is a summary of the adjustments to AFC's previously issued financial statements for fiscal years 2000 and 2001, and the first three quarters of fiscal year 2002.

| (IN MILLIONS) | EFFECT ON PREVIOUSLY REPORTED EARNINGS INCREASE (DECREASE) | | |
|---|---|---|---|
| ISSUE | Q1-Q3 2002 | 2001 | 2000 |
| 1) Gains associated with unit conversions | $ (4.8) | $(8.9) | $ (3.5) |
| 2) Impairment of long-lived assets | 0.7 | (8.4) | (0.3) |
| 3) Post-employment payments to a former officer | 0.1 | (2.9) | _ _ |
| 4) Cinnabon purchase accounting | (0.9) | (2.4) | (1.5) |
| 5) Inventory adjustments at Seattle Coffee | 2.2 | (1.8) | (0.7) |
| 6) Equipment placed at Seattle Coffee customers | (0.1) | (1.4) | (1.6) |
| 7) Accrued liabilities | 0.8 | (0.7) | (1.0) |
| 8) Capitalized interest | (0.1) | (0.9) | (0.4) |
| 9) Business taxes and related professional fees | (0.2) | (0.9) | 0.2 |
| 10) Slotting fees at Seattle Coffee | (0.3) | (0.9) | (0.1) |
| 11) Beverage rebates | (0.2) | (0.8) | 0.3 |
| 12) Rent expense | (0.6) | (0.8) | (1.0) |
| 13) Sales allowances at Seattle Coffee | 0.3 | (0.6) | (0.2) |
| 14) Recognition of re-imaging costs | _ _ | (0.6) | 0.3 |
| 15) Future lease obligations -- closed units | (0.4) | 0.8 | (1.3) |
| 16) Advertising funds | _ _ | (0.4) | (0.3) |
| 17) Leasehold improvement -- useful lives | (0.6) | (0.3) | (0.1) |
| 18) Legal accrual | _ _ | _ _ | 1.5 |
| 19) Capitalized expenses | (0.2) | _ _ | (1.3) |
| 20) Workers' compensation accrual | _ _ | _ _ | (1.3) |
| 21) Group medical insurance accrual | 0.4 | _ _ | (1.0) |

| 22) Other | (0.4) | 0.3 | 0.1 |
| Subtotal | (4.3) | (31.6) | (13.2) |
| Tax effect | 1.9 | 10.3 | 4.0 |
| Cumulative effect of accounting change(*) | 5.6 | | |
| Total | 3.2 | $(21.3) | $ (9.2) |

The reasons for the falsity of these financial statements are varied and numerous, as discussed below. It is important to note, however, that the aggregate effect of these various misstatements, seemingly almost inconsequential when viewed in isolation, allowed AFC to book income at the precise level forecasted by analysts, even though the true levels of income were substantially lower than those forecasted, and differed from the forecasts by widely varying degrees. This fact alone gives rise to the inference that a scheme of manipulation was at work —what are the odds that random, innocuous accounting errors would have the effect of causing AFC's numbers to meet Wall Street expectations exactly, or by a margin of one cent for at least seven quarters in a row — especially when statements such as Defendant Belatti's, quoted above, underscore the deep and abiding connection between AFC's meeting its EPS guidance and the value of its stock?

## Unit Conversions

A key example of the manipulations employed by the Defendants was AFC's failure to defer gains associated with "unit conversions." During the Class Period, AFC sold certain company-owned restaurants, bakery or café units to franchisees.

- 10 -

AFC refers to this type of transaction as a "conversion." This conversion program was highly touted by Defendants as a way for AFC to boost the bottom line. AFC, improperly and prematurely, immediately recognized gains on many of these sales to franchisees at the time it sold the company-owned restaurant, bakery or café units. Because AFC continued to have significant ongoing obligations and involvement in the assets or financing of the purchase of the assets beyond the customary franchisor role, GAAP precluded immediate gain recognition and instead required material portions of the gain to be recognized ratably over the period of continued involvement. For example, according to a confidential witness, AFC often gave franchisees a "development note" that provided the financing needed to purchase the stores. As long as the franchisee met certain AFC-established development goals for five years, the franchisee's debt obligation was extinguished.

AFC's typical conversion transaction involved the sale of restaurants, bakeries or cafes in a multi-unit group, and each group often involved a mixed deal structure, in which not all parts of the transaction were treated in the same manner. For example, AFC often would sell some restaurant assets, and lease others, to the franchisee. In such situations, GAAP clearly required that the portion of the gains related to the leased assets be deferred because AFC maintained continuing involvement with the assets beyond the customary franchisor role. In addition,

- 11 -

AFC's own disclosures in its financial statements demonstrate that it often had ongoing contingent liabilities relating to financing the sale of the assets to the franchisee. AFC typically provided loan and/or lease guarantees to the franchisee buying an AFC store, which clearly illustrate that AFC had significant, continuing obligations, contingent or otherwise.

Accordingly, in each conversion transaction, the proceeds should have been allocated among the different deal components, and where AFC had significant ongoing involvement, such as serving as a landlord for some of the unit properties or providing seller financing or loan guarantees, a portion of the gain should have been deferred and recognized over the term of the continuing involvement in accordance with GAAP. During the Class Period, however, AFC was simply recognizing revenue for all components of a deal at the time of the conversion without considering its outstanding obligations. As alleged in detail at ¶¶ 159-164 of the Complaint, Defendant Wilkins was the impetus for AFC's conversion strategy, personally authorizing many of the transactions for which gains were improperly recognized.

### Slotting Fees

Through its Seattle Coffee subsidiary, AFC also capitalized "slotting fees" paid or credited to wholesale customers for favorable shelf space, and improperly

amortized these fees over a two-year period. AFC did this despite the fact that neither the slotting agreements nor the written contracts contemplated that the fees covered a two-year period. These slotting fees were regular marketing costs that did not cover future periods and, accordingly, should have been expensed immediately as sales discounts when incurred. It is also clear that AFC manipulated its slotting fee expenses in other ways. A confidential witness reports that he was instructed by a superior to purposely delay posting credits taken by customers for slotting fees and advertising owed them to the general ledger "in order to make the quarter look better." This made the quarter "look better" because an expense or "credit" was not recorded.

By improperly capitalizing these costs, AFC understated its expenses by $0.1 million, $0.9 million, and $0.3 million in 2000, 2001, and the first three quarters of 2002, respectively. AFC has since restated this improper accounting.

### Impairment of Long-Lived Assets

AFC also violated GAAP by failing to write down in a timely manner the value of certain company-owned stores that were performing poorly, or would be closed. Despite stating in its 2000 and 2001 Forms 10-K that (1) management periodically reviewed the performance of restaurant, bakery, café and other long-lived assets, and (2) when it was determined that a store would be closed, the carrying value of the

- 13 -

property and equipment was to be adjusted to net realizable value, AFC failed to write down the value of such impaired assets.

FAS 121, *Accounting for the Impairment of Long-Lived Assets and for Long-Lived Assets to Be Disposed Of*, ¶¶4-5, requires review of long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amounts on the books may not be recoverable. FAS 121 further states that an example of such an event is "[a] current period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue." The rule further states that, when an asset is determined to be impaired, it should be written down to its net realizable value and a loss shall be recognized at that time.

AFC was aware of exactly which stores were impaired and which were not, yet it failed to write down the impaired assets. AFC systematically tracked the financial performance of each company-owned store, as evidenced by detailed internal profit and loss reports that tracked, on a store-by-store basis, sales, expenses and store operating profit or loss. These reports broke out the expenses in minute detail by type, by line item, in columns for each month, on a separate page for each store, and by store number. Despite this awareness of which stores were not profitable and

- 14 -

therefore were, in accounting parlance "impaired," AFC refused to properly write down impaired properties because it would negatively impact its net income.

AFC's claim in its December 15, 2003 Form 8-K that this failure was simply an "oversight" because it evaluated its properties on a "market basis" rather than a "site-by-site basis" is nonsensical, simply false and refuted at a minimum by the available information in these expense reports. This explanation is further discredited by the fact that AFC clearly monitored this information to pick which stores to close (a monitoring practice it disclosed in the footnotes to its Forms 10-K for 2000 and 2001). AFC possessed the individual store information, yet failed to write down the impaired assets as required by GAAP:

> The Board concluded that for testing whether an asset is impaired and for measuring the amount of the impairment loss, assets should be grouped at the lowest level for which there are identifiable cash flows that are largely independent of the cash flows generated by other asset groups. *See* FAS 121 ¶95.

¶ 192.    By being aware that its assets were impaired and failing to make the appropriate and timely write-down, AFC violated these GAAP provisions. As a result, AFC understated expenses by \$0.3 million in 2000 and \$8.4 million in 2001. The restatement decreased expenses in 2002 as those expenses were adjusted back to 2001 and 2000.

## Write Down of Inventory

AFC, at its Seattle Coffee subsidiary, improperly avoided taking charges in 2000 and 2001 to write down inventory for the impact of costing changes, inventory obsolescence issues, package design changes and a non-integrated inventory accounting system. Such expense avoidance was in violation of both GAAP and AFC's own publicly stated policy. AFC did not publicly disclose this overvaluation of inventory until the third quarter of 2002 – when these adjustments became too large to be ignored. However, when AFC tried to squeeze more than two years' worth of these inventory adjustments into the financial statements for the third quarter of 2002, KPMG, upon discovering this, made them appropriately reverse the adjustment and restate the adjustment back to 2001 and 2000, where it belonged.

Inventory improprieties of this magnitude could not continue to go on year after year without awareness by AFC and its officers and directors. The 2001 inventory adjustment alone was $1.8 million, representing approximately 11% of the total consolidated inventory balance for the entire company (not just Seattle Coffee) as of the end of 2001. The $1.8 million in overstated Seattle Coffee inventory, as a percentage of Seattle Coffee's own inventory balance, was so large that, had AFC properly written down the inventory, it would have been impossible for investors to ignore, particularly given that the total improper overstatement at that date was

- 16 -

further inflated by \$0.7 million from 2000, representing approximately 5% of AFC's entire consolidated inventory balance at the end of 2000. ARB No. 43, Chapter 4, Statement 5 requires excess and obsolete inventory to be written down as a charge against income in the period in which it occurs.

Despite the fact that AFC's SEC filings stated that its policy was to state inventories "at the lower of cost (determined on a first-in, first-out basis) or market," AFC did not make the required adjustment. By failing to write down the value of its impaired inventory in a timely fashion, Defendants violated GAAP and its own stated policy. Consequently, AFC understated its expenses in 2000 and 2001 by \$0.7 million and \$1.8 million, respectively.

### Understatement of Expenses

AFC's management engaged in a number of manipulations that had the effect of improperly understating AFC's expenses in a given reporting period, which in turn inflated reported net income. ¶¶ 165-178. GAAP requires expenses to be recorded in the period in which they are incurred. This concept is one of the most basic tenets underlying accrual accounting. AFC and its officers ignored this most basic rule, and systematically engaged in a scheme of improperly timing AFC's expense recognition. Typically, AFC understated its expenses in a current period and/or improperly delayed expense recognition for as long as possible – in this case, until they were

- 17 -

caught by KPMG.

AFC improperly timed expense recognition in at least six ways: (1) by improperly deferring current period expenses to later periods; (2) by improperly capitalizing non-capitalizable expenses as assets and amortizing them over time rather than correctly expensing them at the time they were incurred; (3) by failing to record rent expense on a straight-line basis; (4) by improperly assigning excessive useful lives to leasehold improvements, which resulted in artificially reduced depreciation expense for any given period; (5) by misclassifying professional tax fees to liability accounts instead of expensing them as incurred; and (6) by accruing and capitalizing certain acquisition costs instead of expensing them as incurred.

Another key manipulation was AFC's improper understatement of rent expenses. ¶¶179-181. In violation of GAAP, AFC did not record rent expense on a straight-line basis for all leases. Under the "straight-line" method, the total payments over the life of the lease are used to calculate an average payment. The resulting average payment is then recorded as an expense in each period instead of recording the actual monthly payment. By improperly recording the actual monthly rent payments early in the lease instead of calculating and recording the average rent, AFC improperly recorded less rent expense than required by GAAP.

Notwithstanding the fact that "straight-lining" rent is a common, well-known

- 18 -

accounting rule under FAS 13, it is clear that AFC disregarded the rule. For example, the restatement disclosures in AFC's 2002 10-K revealed that it applied the "straight line" rule to some leases, but ignored it on others. Additionally, it is quite telling that AFC ignored this accounting rule when its application would reduce AFC's net income but applied it if doing so increased AFC's net income. For example, as disclosed in the footnotes to the 2002 10-K, when AFC acted as a landlord receiving rents, it complied with FAS 13 and recorded rental income on an average, "straight-line" basis, so that it could record more rental income in the earlier years of a lease than it was actually receiving in rental payments.

This impropriety caused understated expenses of $3.8 million in years prior to 2000, and understated expenses during the Class Period of $1.0 million, $0.8 million, and $0.6 million in 2000, 2001, and the first three quarters of 2002, respectively. AFC has since restated this improper accounting.

### Other Manipulations

AFC and its management engaged in a litany of other accounting manipulations that allowed the Company to falsely report operating results that met analysts' expectations, including:

- inflation of asset useful life estimates to understate expenses, as alleged at ¶¶ 182-183;

- failure to expense professional tax fees as incurred, as alleged at ¶ 184;

- improper recognition of expenses for renovations and improvements, as alleged at ¶ 185;

- improper purchase accounting, as alleged at ¶¶ 186-188;

- failure to adequately accrue liabilities, as alleged at ¶¶ 200-201;

- improper capitalization of interest, as alleged at ¶¶ 202-203;

- improper accounting for rebates, as alleged at ¶ 204;

- use of insupportable rental income projections, as alleged at ¶¶ 205-206;

- failure to consolidate advertising funds, as alleged at ¶¶ 207-208; and

- improper recording of accruals, as alleged at ¶¶ 209-210;

Notwithstanding the various manipulations outlined above, AFC was at least severely reckless in maintaining inadequate internal accounting controls. In fact, AFC stated that its auditor, its audit committee and the audit committee's investigation concluded that there were significant control deficiencies that constituted material weaknesses in the Company's control environment. See Ex. 99.4 to the 12/15/03 Form 8-K. Moreover, AFC ultimately disclosed in its 2002 Form 10-K that it began implementing no less than fifteen actions during 2003 necessary to bring internal controls to an adequate level.

In addition to the above-outlined accounting manipulations and their effect on AFC's reported financials, as alleged in detail at ¶ 150 (i)-(ix) of the Complaint, other evidence of Defendants' scienter includes: (1) suspicious, massive insider stock sales

during the Class Period, ¶¶ 6-7, 28-29, 32, 35, 44, 47, 90-91, 219-220; (2) Defendant

Pennington's intimate involvement and familiarity with AFC's accounting practices

resulting from his membership on the Company's Audit Committee, ¶¶ 222-224; (3)

Defendants' enormous cash bonuses contingent on AFC's performance and stock

value appreciation, ¶¶ 227-230; and (4) the disparate array of accounting

improprieties, some seemingly innocuous in isolation, which had the combined effect

of allowing AFC to meet analysts' consensus forecasts almost exactly and for every

period restated.

## III.   ARGUMENT

### A.   Pleading Requirements Under the PSLRA

Securities fraud defendants routinely proclaim at the outset of their dismissal

arguments that the PSLRA was enacted to combat frivolous securities lawsuits,

implicitly suggesting, as Defendants have done here, that Plaintiffs' claims are

frivolous. It is not surprising that these defendants also conveniently fail to mention

that another purpose of the PSLRA is "to encourage plaintiffs' lawyers to pursue valid

claims . . . ." S. Rep. No. 104-98, at 4 (1995) (emphasis added). In enacting the

PSLRA, Congress made it clear that:

> The overriding purpose of our Nation's securities laws is to protect
> investors and to maintain confidence in the securities markets, so that
> our national savings, capital formation and investment may grow for the
> benefit of all Americans....   Private securities litigation is an

indispensable tool with which defrauded investors can recover their losses without having to rely upon government action.

H.R. Conf. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 730.

Defendants wrongly imply that Plaintiffs' Complaint is frivolous. <u>See</u> Memorandum of Law in Support of Defendants AFC, Belatti, Frankel, Holbrook and Wilkins' Motion to Dismiss the Consolidated Amended Complaint ("AFC Def. Br.") at 5, 8. They assert that Plaintiffs' allegations "do little more than parrot AFC's own filings and fail utterly to plead their claims with particularity," because, as Defendants see it, the Complaint fails to "allege *any* facts – as is their burden – that support *any* inference that *any* Defendant knew that *any* statement was false at the time it was made." AFC Def. Br. at 6-7 (emphasis in original). But an evaluation of Defendants' argument reveals that it is as infirm as its clients' financial disclosures are false and misleading.

The PSLRA did not change the standards for a motion to dismiss under Fed. R. Civ. P. 12(b)(6) in the Eleventh Circuit. <u>See</u> <u>Bryant v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1287 (11th Cir. 1999). When ruling on a motion to dismiss, a court should accept all factual allegations in a complaint as true and construe those allegations and all inferences in the light most favorable to the plaintiffs. <u>In re Scientific-Atlanta, Inc. Sec. Litig.</u>, 239 F. Supp. 2d 1351, 1357 (N.D. Ga. 2002) ("Scientific-Atlanta I")

- 22 -

(Story, J.)[4]. See also Cooper v. Pate, 378 U.S. 546 (1964); Lopez v. First Union Nat'l
Bank, 129 F.3d 1186, 1189 (11th Cir. 1997). "The court should grant a motion to
dismiss only when it appears beyond doubt that the plaintiff can prove no set of facts
in support of his claim which would entitle him to relief." In re JDN Realty Corp.
Sec. Litig., 182 F. Supp. 2d 1230, 1239 (N.D. Ga. 2002) (citing Conley v. Gibson,
355 U.S. 41, 45-46 (1957)).

The Court must read the Complaint as a whole and give Plaintiffs the benefit of
every reasonable inference. See Bryant, 187 F.3d at 1274 n.1. See also JDN Realty,
182 F. Supp. 2d at 1239. "Notice pleading is all that is required for a valid [securities
fraud] complaint [and u]nder notice pleading, the plaintiff need only give the
defendant fair notice of the plaintiff's claim and the grounds upon which it rests." In
re Theragenics Corp. Sec. Litig., 137 F. Supp. 2d 1339, 1345 n.2 (N.D. Ga. 2001)
("Theragenics II").

Rule 9(b) pleading requirements are not intended to be insurmountable. "[T]he
Complaint need only provide a reasonable delineation of the underlying acts and

---

[4] Defendants wrongly contend that a court must consider inferences unfavorable to
Plaintiffs when deciding whether to grant the motions to dismiss. AFC Def. Br. at
11. This Court has recently reaffirmed that the Court should not weigh Plaintiffs'
suggested inferences against other inferences favorable to Defendants. See
Switzenbaum v. Internet Security Systems, Inc., No. 1:01-CV-2601-WBH, slip op. at
3 (N.D. Ga. Apr. 13, 2004) (attached hereto as Ex. A).

transactions allegedly constituting the fraud." Anderson v. Transglobe Energy Corp., 35 F. Supp. 2d 1363, 1369 (M.D. Fla. 1999) (emphasis added). Rule 9(b) should be applied with flexibility when the key information remains in defendants' possession. See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997). Thus, to satisfy Rule 9(b), a plaintiff is not required to plead details such as dates, times, and places with absolute precision so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based. In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192 (SHS), 2001 WL 293820, at *8 (S.D.N.Y. Mar. 27, 2001). Rule 9(b) is satisfied when the Complaint specifies what fraudulent statements were made, generally identifies who made them, states where and when they were made, and explains why the statements were false or misleading. In re Theragenics, Inc. Sec. Litig., 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000) ("Theragenics I"); JDN Realty, 182 F. Supp. 2d at 1240. "This means the who, what, when, where, and how: *the first paragraph* of any newspaper story" – *not* the entire news article. Gross v. Medaphis Corp., 977 F. Supp. 1463, 1470 (N.D. Ga. 1997) (emphasis added). In addition, Rule 9(b) does not apply to claims brought under Sections 11 and 12 of the Securities Act of 1933. In re Premiere Technologies Inc., Sec. Litig., No. 1:98-CV-1804-JOF, slip op. at 22, n.6 (N.D. Ga. Dec. 14, 1999) ("Premiere Tech I") (attached hereto as Ex. B).

The PSLRA did not alter the requirements of Rule 9(b). Plaintiffs must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. §78u-4(b)(1). In other words, a sufficient complaint "identifies the circumstances of the alleged fraud so that defendants can prepare an adequate answer." Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1998). Courts should not "hold plaintiffs to a standard that would effectively require them pre-discovery, to plead evidence," because while "Rule 9(b) proscribes the pleading of fraud by hindsight . . . neither can plaintiffs be expected to plead fraud with complete insight." Shaw v. Digital Equipment Corp., 82 F.3d 1194, 1225 (1st Cir. 1996) (internal quotation marks and citation omitted).

## B. Defendants' Accounting Manipulations Are Pled With the Requisite Particularity

Plaintiffs have clearly and adequately alleged that AFC's reported financial results were in violation of GAAP, which is further evidenced by AFC's restatement for *every period in which it was a publicly traded company* until the end of the Class Period in April 2003.[5] This Court has addressed the specificity needed to properly

---

[5] Courts in this jurisdiction have determined that violations of GAAP and GAAS may constitute false or misleading statements of material fact in violation of Rule 10b-5. Carley Capital Group v. Deloitte & Touche, LLP, 27 F. Supp. 2d 1324, 1335 (N.D. Ga. 1998); Medaphis Corp., 977 F. Supp. at 1472. See also SEC v. Sys. Software Assocs., Inc., 145 F. Supp. 2d 954, 958 (N.D. Ill. 2001) ("A financial statement that recognizes revenue and does not conform to the requirements of

- 25 -

plead accounting fraud:

> To state a claim for accounting fraud, a plaintiff must adequately plead
> facts sufficient to support a conclusion that the defendant prepared false
> financial statements, and that the alleged financial fraud was material.

In re Premiere Tech., Inc. Sec. Litig., No. 1:98-CV-1804-JOF, 2000 WL 33231639 at

*17 (N.D. Ga. Dec 8, 2000) ("Premiere Tech II").  See also Burlington Coat, 114

F.3d at 1417-18 (finding that plaintiffs have sufficiently alleged a claim where they

state the unreasonable accounting practices).  The Complaint sets forth in great detail

the manner in which AFC:

    (1)    failed to defer gains associated with unit conversions;

    (2)    improperly understated several different types of expenses;

    (3)    failed to expense professional tax fees as incurred;

    (4)    improperly recognized expenses for renovations and improvements;

    (5)    engaged in improper purchase accounting;

    (6)    failed to write down impaired assets at poorly performing stores;

    (7)    improperly accounted for inventory at its Seattle Coffee subsidiary;

---

GAAP is presumptively a false or misleading statement of material fact under Rule
10b-5."); In re Aetna, Inc. Sec. Litig., 34 F. Supp. 2d 935, 956 (E.D. Pa. 1999)
(explaining that distorting financial information with unreasonable accounting
practices can be the basis of a securities fraud claim.); Marksman Partners, L.P. v.
Chantal Pharmaceutical Corp., 927 F. Supp. 1297, 1305 (C.D. Cal. 1996) ("A
company's overstatement of revenues . . . in violation of [GAAP] can constitute a
false or misleading statement of material fact necessary to establish a Section 10(b)
and 10b-5 violation").

(8)    failed to adequately accrue liabilities;

(9)    improperly capitalized interest;

(10)   improperly accounted for rebates;

(11)   used unsupportable rental income projections;

(12)   failed to consolidate advertising funds; and

(13)   improperly recorded several expense accruals

The Complaint specifies the reasons why Defendants' accounting practices violated GAAP. ¶¶ 152-218.

Although Defendants purport to argue the lack of particularity of the Complaint at length, the vast majority of the arguments are actually centered around whether the Complaint adequately alleges scienter. See e.g., AFC Def. Br. at 16-27, "there are no particular factual allegations to suggest that any of the accounting errors corrected through AFC's restatement resulted from 'intentional misuse of the facts known at the time . . .'" (AFC Def. Br. at 16); "[a]lthough Plaintiffs repeatedly aver or at least imply that the errors were intentional, there is no basis pled for those contentions" (AFC Def. Br. at 18)). In fact, Defendants implicitly acknowledge this by relying on cases construing the pleading requirements for scienter. See AFC Def. Br. at 18; First Union Corp. Sec. Litig., 128 F. Supp.2d 871, 887-88 (W.D.N.C. 2001); In re Ashworth, Inc. Sec. Litig., No. 99CV0121-L(JAH), 2000 WL 33176041, at * 7 (S.D. Cal. Jul. 18, 2000). Defendants' arguments are an attempt to divert the

- 27 -

Court's attention away from the extensive, specific detail in which the Complaint shows that Defendants committed securities fraud.

A similar attempt at misdirection underlies Defendants' argument that the Complaint fails to allege who at AFC was responsible for the accounting for the items that were restated. Defendants insinuate that the Complaint should be dismissed because it improperly relies on the group pleading doctrine. AFC Def. Br. at 11, 18. Yet, the Complaint specifically identifies the individuals responsible for ensuring the accuracy of the Company's financial statements and who made public statements vouching for their accuracy. The Complaint alleges the speaker and the content of such statements. ¶¶ 10, 29, 80-81, 86, 93, 99, 101, 103, 106-11, 120, 122, 124-26, 134. The Complaint also sets forth the individuals who signed the quarterly and annual reports as well as the prospectuses and registration statements for the initial and secondary offerings. ¶¶ 8, 31, 53, 61, 75, 82, 87, 90, 94, 100, 112, 127-28. By signing the SEC filings, Defendants are responsible for the false and misleading statements contained therein.

In any event, the "vast majority of cases decided nationwide,"[1] have concluded that the group pleading doctrine survives the PSLRA. See generally Schwartz v.

---

[1] In re Century Bus. Servs. Sec. Litig., No. 1:99CV02200, 2002 WL 32254513 at *13 & n. 26 (N.D. Ohio 2002)(gathering "plethora" of decisions).

Celestial Seasonings, Inc., 124 F. 3d 1246, 1254 (10th Cir. 1997); In re Raytheon

Sec. Litig., 157 F. Supp. 2d 131, 152 (D. Mass. 2001);  In re Smartalk Teleservices,

Inc. Sec. Litig., 124 F. Supp. 2d 545 (S.D. Ohio 2000); In re Ribozyme Pharms., Inc.

Sec. Litig., 119 F. Supp. 2d 1156, 1165 (D. Colo. 2000); In re Baan Co. Sec. Litig.,

103 F. Supp. 2d 1, 17 (D.D.C. 2000); In re Oxford Health Plans, 187 F. R. D. 133,

142 (S.D. N.Y. 1999); In re Aetna, Inc. Sec. Litig., 34 F. Supp. 2d 935, 948-49 (E.D.

Pa. 1999); In re Stratosphere Corp. Sec. Litig., 1 F. Supp 2d 1096, 1108 (D. Nev.

1998).

    While the Eleventh Circuit recently expressly declined to take a position on

whether the group pleading doctrine survives the PSLRA, Scientific-Atlanta II, 2004

WL 1382906, at *3 (noting that "courts are now debating" the viability of the group

pleading doctrine after passage of the PSLRA, but finding it unnecessary to address

the issue in resolving the appeal), courts in this jurisdiction have held that the group

pleading doctrine remains viable.  In re Cryolife, Inc. Sec. Litig., No. 02-CV-1868

(BBM), slip op. at 35 n. 7 (N.D. Ga. May 27, 2003) (Martin, J) (Attached hereto as

Ex. C); Lewis v. Advanced Technical Products Inc., Civil Action File No. 1:00-CV-

1702-WBH, slip op. at 20 (N.D. Ga. Aug. 28, 2001) (Hunt, J.) (Attached hereto as

Ex. D); JDN Realty, 182 F. Supp. 2d at 1250-51 (Story, J.); Theragenics I, 105 F.

Supp. 2d at 1357-58; World Access, 119 F. Supp. 2d at 1357 (Evans, J.).

Accordingly, Plaintiffs may rely upon the group pleading doctrine to meet the particularity requirements of the PSLRA.

### 1. Plaintiffs Have Provided Sufficient Detail Regarding the Improper Gains on Unit Conversions

The Complaint contains a wealth of information regarding AFC's contravention of GAAP in recording gains on unit conversions. ¶¶ 152-164. The Complaint describes AFC's practices of providing franchises with a "development note" giving the franchisee the financing to purchase AFC stores, loan and/or lease guarantees and the methods for extinguishing the debt obligation. ¶¶ 152, 154. The Complaint sets forth the specific GAAP provisions violated by AFC's unit conversion accounting and the ways in which AFC evaded them. ¶¶ 155-57. It also describes in great detail: (1) the documentation involved in the unit conversions; (2) the signatures required on that documentation; (3) that Defendant Wilkins' signature was a condition precedent to any deal closing; (4) that the net gain on each sale was clearly listed on the final page of each Approval Document; and (5) AFC's maintenance of a flow-chart containing all of the "on-going" deals and the expected impact of those deals on the Church's Chicken earnings. ¶¶ 160, 164. The Complaint sets forth several detailed examples showing how AFC contravened GAAP and improperly recorded the gain on unit conversions in Alabama, Florida, Texas, Oklahoma and Louisiana. ¶¶ 162-63.

The extensive detail provided in the Complaint is far more descriptive than the information contained in AFC's restatement, and Defendants' argument to the contrary, AFC Def. Br. at 20, is therefore plainly wrong.[6]  And, as discussed in Sections C(2) and (5) below, Plaintiffs have sufficiently alleged that Defendant Wilkins, along with Defendants AFC, Belatti, Holbrook and Pennington, knew or were severely reckless in disregarding that the method for recording gains on unit conversions contravened GAAP and would require restatement.

Defendants' argument that Plaintiffs do not allege how much of the gains that were initially recognized should have been deferred, see AFC Def. Br. at 21, is similarly faulty as Plaintiffs are not required to provide that level of specificity in the Complaint.  Defendants cite to no authority to support their position, which has been repeatedly rejected by this Court.  Premiere Tech. II, 2000 WL 33231639, at * 17 ("the complaint need not specify the exact dollar amount of each accounting error"); Carley Capital, 27 F. Supp. 2d. at 1335; In re World Access Sec. Litig., 119 F. Supp. 2d 1348, 1355 (N.D. Ga 2000) ( "[i]t is not fatal to the complaint that it does not describe in detail each single specific transaction in which Defendants transgressed,

---

[6] Defendants' arguments regarding the alleged lack of knowledge by Defendant Wilkins or any other AFC Defendant is an argument regarding scienter, not particularity.  See AFC Def. Br. at 21.

by customer, amount, and precise method").[7]

Similarly, Plaintiffs are not required to allege why its previous external auditor, Arthur Andersen, approved of AFC's unit conversion accounting or why any of the Individual Defendants were not entitled to rely upon Andersen's certification of AFC's financial statements. Defendants have not provided any caselaw to support such an argument. In any event, issues of reliance are not properly adjudicated on a motion to dismiss, good faith reliance being an affirmative defense for which Defendants bear the burden of proof. See In re Enron Corp. Securities, Derivative & ERISA Litigation, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003); In re Global Crossing,

---

[7] In In re Merchants Acceptance Corp. Sec. Litig., No. 97 C 2715, 1998 WL 781118 (N.D. Ill. 1998), the defendants moved to dismiss a similar complaint in part because the complaint did not state the "precise amount of the overstatement of earnings." Id. at *8. While the court noted that this information would be required at some point in the proceedings, it concluded, "given that most of this information is in the hands of the defendants, the court finds that plaintiffs have satisfied their burden at this stage of the litigation," and held that plaintiffs had pled the defendants' misrepresentation with sufficient particularity. Id. (emphasis added); accord Chu v. Sabratek Corp., 100 F. Supp. 2d. 815, 821 (N.D. Ill. 2000) ("Although we agree with [defendants] that the plaintiffs have failed to allege several details regarding [defendants'] allegedly improper revenue recognition practices, such as the dollar amounts by which [defendants' financials] have been misstated as a result of these transactions, the plaintiffs have alleged sufficient facts to meet their burden at this stage in litigation."); In re Computer Assoc. Class Action Sec. Litig., 75 F. Supp. 2d. 68, 73 (E.D.N.Y. 1999) ("Unknown specifics, such as the exact amount the earnings have been overstated are not fatal in this case. Plaintiffs allege such a widespread fraudulent practice, that if true, would have a huge net effect in error as to the company's overall figures and is the type of information particularly within the defendants' control.").

Ltd. Sec. Litig., 313 F. Supp. 2d 189, 211 (S.D.N.Y. 2003); In re Hamilton Bankcorp, Inc. Sec. Litig., 194 F. Supp. 2d 1353, 1357 (S.D. Fla. 2002).

### 2. The Improper Capitalization of Slotting Fees is Sufficiently Detailed

The allegations regarding the improper capitalization of slotting fees have been pled with the requisite particularity. The Complaint sets forth the way AFC contravened specifically enumerated GAAP provisions and the amount of the understatement of expenses. ¶¶ 174-76. The statement from a Seattle Coffee credit department employee regarding the instruction to delay posting credits taken by customers for slotting fees and advertising, in order to make the quarterly operating results look better, buttresses the claims that the Company contravened GAAP and would eventually have to restate its financial results. See ¶ 175. Also, these statements describe the persons involved in the accounting manipulation. Id. As discussed above, Plaintiffs are not required to plead the exact dollar amount of the accounting error in the Complaint. Premiere Tech. II, 2000 WL 33231639, at *17; Carley Capital, 27 F. Supp. 2d. at 1335. Accord World Access, 119 F. Supp. 2d at 1355.[8]

---

[8] Defendants' knowledge regarding the accounting manipulation, AFC Def. Br. at 22, is an issue specific to scienter and is discussed below.

3.     **The Complaint Pleads the Company's Failure to Write Down Impaired Assets With the Requisite Particularity**

Plaintiffs' allegations regarding AFC's failure to write down impaired assets at poorly performing stores are more than sufficient to meet the particularity requirement of the PSLRA. The Complaint alleges that AFC not only violated FAS 121, but its own policy, disclosed in its 2000 and 2001 Forms 10-K, that (1) management periodically reviewed the performance of restaurant, bakery, café and other long-lived assets, and (2) when it decided a store would be closed, the carrying value of the property and equipment was adjusted to net realizable value. ¶¶ 189-90. Although AFC disclosed it was the Company's policy to evaluate operating restaurant, bakery and café properties on a market basis, AFC also undertook the affirmative obligation stated above, which places a higher burden on AFC than a simple market-based analysis. Contrary to Defendants' argument, AFC Def. Br. at 25, Plaintiffs bear no burden to speculate as to why AFC chose not to follow its disclosed policy.[9] Rather, the pertinent question is simply whether AFC contravened GAAP and its own policies by its failure to properly evaluate impairment of its long-

_____

[9] Additionally, Defendants' citation of annual financial statements and proxy statements of AFC's competitors should be ignored as these documents are not properly before this Court. The documents were not attached to the Complaint, incorporated by reference into the complaint or relied upon by plaintiffs in bringing suit and cannot be judicially noticed because they are not SEC filings of AFC. See Bryant, 187 F.3d at 1280; Theragenics I, 105 F. Supp. 2d at 1348.

- 34 -

lived assets. The answer is yes.

Further support for Plaintiffs' allegations is found in the statements regarding AFC's systematic tracking of the financial performance of each company-owned store in its detailed internal profit and loss reports. ¶ 191. These reports track, on a store-by-store basis, sales, expenses and store operating profit or loss and break out the expenses in minute detail by type, by line item, in columns for each month, on a separate page for each store and by store number. Id. Therefore, Defendants' argument that the allegation is improperly pled upon "information and belief," AFC Def. Br. at 23, should be rejected. Defendants' argument that Plaintiffs have not raised a strong inference that any Defendant intentionally or severely recklessly applied the wrong method to evaluate asset impairment, AFC Def. Br. at 23-24, once again interjects a scienter inquiry where it does not belong.[10] As evidenced below, Plaintiffs have sufficiently alleged that Defendants possessed the requisite scienter.

Defendants' citation to Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194 (11th Cir. 2001) is misleading because Defendants neglect the Court's statement that "[t]he application of Rule 9(b), however, must not abrogate the concept of notice pleading."

---

[10] Defendants' continued reference to a possible defense of reliance on its auditors, AFC Def. Br. at 24, is not discussed because, as argued above, it is not properly adjudicated on a motion to dismiss. See Enron Corp., 258 F. Supp. 2d at 639; Global Crossing, 313 F. Supp. 2d at 211; Hamilton Bankcorp, 194 F. Supp. at 1357.

- 35 -