It is the collective weight of scienter evidence, not each element standing alone, that provides sufficiency. As one Court explained:

> Defendants cite cases which hold that allegations that the defendant acted with the motive and opportunity to make a profit will not suffice to establish scienter. . . . Finding another motive, however, is not a requirement for establishing scienter. Indeed, it is difficult for the Court to imagine a situation, in securities fraud cases, where the motive would be anything other than financial profit. The cited case law merely stands for the proposition that, absent other factors establishing scienter, a mere motive to make money is insufficient. . . . In this case, however, Plaintiffs have established the existence of false or misleading statements, along with facts that, in the Court's view, support a strong inference that the Defendants knew that their representations [were misleading], aside from any allegations of motive.

Young v. Nationwide Ins. Co., 2 F. Supp.2d 914, 922 (S.D. Tex. 1998).

Moreover, "[w]hen financial incentives to exaggerate earnings go far beyond the usual arrangements of compensation based on the company's earnings, they may be considered among other facts to show scienter." Aldridge v. A. T. Cross Corp., 284 F. 3d 72, 83 (1st Cir. 2002). "The adjustments in the exercise price of the defendants' stock options alone are not enough to create a strong inference of scienter. But this fact is not alone here." Id. at 84. Aldridge relied on the court's ruling in Green Tree, 270 F. 3d at 661 that "the magnitude of Coss's compensation package, together with the timing coincidence of an overstatement of earnings at just the right time to benefit Coss, provides an unusual, heightened showing of motive to commit fraud."

- 61 -

Viewed in this light, the allegations concerning executive compensation are sufficient to survive a motion to dismiss. As in <u>Young</u>, in this instance, Plaintiffs do not rely solely upon bald assertions that the defendants were highly paid executives. Instead, the Complaint carefully and precisely alleges that Defendants, having grown accustomed to high bonuses and returns on stock options that were all linked to stock performance, saw the imminent decline of AFC's good fortune. Rather than acknowledging this to the public, Defendants manipulated AFC's accounting and continued touting AFC's record sales to the public, all in order to keep the bubble from bursting until <u>after</u> they had taken their advantage.

### c.    Meeting Analysts' Estimates

Defendants essentially concede that meeting analysts' estimates can be indicative of a motive to commit securities fraud. <u>See</u> AFC Def. Br. at 35-36. Defendants' only argument is that Plaintiffs have not set forth a factual basis for their assertion that Defendants falsified their financial results to create the illusion that AFC was meeting analysts' expectations. <u>Id.</u> Even a cursory review of the Complaint shows that the Company met expectations with what appears to be uncanny precision for seven consecutive quarters. ¶¶ 5, 78-79, 83, 85, 88, 92, 96, 103-04, 113, 123, 129, 226. The restatement reveals that this was merely an illusion, as AFC's true but undisclosed financial condition missed the analysts' EPS estimates

for six of seven quarters from AFC's inception as a publicly traded company to the time it issued the massive restatement. ¶¶ 5, 78, 83, 88, 96, 113, 117, 129, 226. The amount of the overstatement in each quarter was exactly or nearly exactly what was required in order to meet estimates.

### 4.    Defendants' Positions Within the Company Accompanied by Their Receipt of Internal Reports and Attendance at Meetings Evidences Their Scienter

Where a defendant "was integrally involved in running [the company] and evaluating the financial condition of the company," scienter is sufficiently alleged. See Zuckerman v. Smart Choice Automotive Group, Inc., No. 99 CV 237 ORL 99A, 2000 U.S. Dist. LEXIS 13489, at *5-6 (M.D. Fla. May 18, 2000).[23]   Moreover, a strong inference of scienter exists where corporate directors – even those not as hands-on as the CEO, CFO, Executive Vice President, and Principal Accounting Officer – would know of adverse facts affecting an important segment of their business. Cosmas v. Hassett, 886 F.2d 8, 13 (2nd Cir. 1989). See also Towne Servs.,

---

[23] Plaintiffs raise a strong inference that Defendants "more likely than not knew that their financial representations were false" when they allege that defendants "were officers . . . of [the Company], that they 'were hands on managers active in [its] day to day operations,' and that they were 'fully familiar with all aspects of [its] businesses and financial conditions and operations.'" Cohen v. Koenig, 25 F.3d 1168, 1174 (2nd Cir. 1994). Compare ¶ 31 (According to a confidential witness, Defendants Wilkins and Holbrook were the "two guys that made decisions" and who "were always concerned with the stock price.").

184 F. Supp. 2d at 1325 ("Difficult scienter issues can arise when information not necessarily within the control of a defendant forms the basis of a fraud claim. In this case, however, the plaintiffs (remaining) claims focus on [information within the defendants' control]")(footnote omitted); Clarus Corp., 201 F. Supp. 2d at 1251. Defendants may not simply disavow knowledge of fraudulent practices, because "facts critical to a business's core operations ... generally are so apparent that their knowledge may be attributed to the company and its key officers." Epstein v. Itron, Inc., 993 F. Supp. 1314, 1326 (E.D. Wash. 1998).

These facts support a strong inference of scienter because top level management is presumed to know of matters that are important to the Company's core businesses. See Towne Servs., 184 F. Supp. 2d at 1325. See also Aldridge, 284 F.3d at 83 (scienter supported by corporate officers' understanding that rollout of new product was "important to their own survival and that of the company"); Pegasystems, Inc., 59 F. Supp. 2d at 235 ("As a matter of law . . . 'facts critical to . . . an important transaction[,] generally are so apparent that their knowledge may be attributed to the company and its key officers.'").

There is no denying that top executives are deemed to be aware of material facts concerning a company's earnings. In re ValuJet, Inc., 984 F. Supp. 1472, 1479-

80 (N.D. Ga. 1997).[24]  In recognition of this fact, courts routinely impute to directors and officers knowledge about adverse developments affecting their company's core business.    See Cosmas, 886 F.2d at 12-13 (directors rightfully imputed with knowledge of elimination of "a potentially significant source of income for the company"); Clarus Corp., 201 F. Supp. 2d at 1251; World Access, 119 F. Supp. 2d at 1355-56 (defendants' knowledge of severe problems with "flagship" product imputed).    Here, the misrepresentations alleged in the Complaint undoubtedly concern the core business operations of AFC.  This can hardly be disputed as the misrepresentations regarding AFC's financial condition included such items as unit conversions, which are an integral part of AFC's franchise business.  The fact that such sweeping misconduct existed in a business so critical to AFC's financial success could hardly have escaped the notice of Defendants, AFC's top executive and financial officers.  Therefore, Defendants' executive positions and access to internal corporate information give rise to a strong inference that they acted with the requisite

---

[24] See also STI Classic Fund v. Bollinger Indus., Inc., No. 3-96-CV-823-R, 1996 WL 885802, at *2 (N.D. Tex. Oct. 25, 1996) ("Based upon [defendants'] respective positions with the company, a strong inference may be drawn that they were knowledgeable about the methods . . . which led to the over-stated . . . revenues reported in SEC filings signed by them.").

scienter.[25]

In this case, the Complaint not only contains allegations regarding Defendants'
scienter as a result of their executive positions and access to internal information, but
also specifically details the meetings that Defendants attended and the types of
reports that they received. AFC's Board of Directors used working committees to
oversee and control AFC's business, which met frequently and received detailed
written and oral reports concerning those parts of AFC's business within their
purview, including (a) the Audit Committee, which worked with AFC's auditors, as
well as AFC officers and employees who were responsible for legal, financial and
accounting matters, reviewed and approved the accounting policies and reporting
practices, internal auditing and internal controls, and compliance with AFC's policies
regarding business conduct; (b) the Executive Committee; (c) the Strategic
Development Committee; and (d) the People Services (Compensation) Committee. ¶¶
25, 40, 222-23. In addition to these committee meetings, AFC senior management
conducted regular meetings in which AFC's financial results and condition were
discussed, including Periodic P&L meetings, Quarterly Business Meetings and

_____

[25] See Towne Servs., 184 F. Supp. 2d at 1325 ("The plaintiffs have properly pleaded
that a "serious" disruption occurred, "massive" customer cancellations
contemporaneously occurred, and an "extraordinary" asset sale was omitted from
earnings reports. No further facts need be pleaded to support a strong inference that
Towne was at least 'severely reckless' if it remained unaware of these facts.").

Annual Business Planning Sessions. ¶ 26. Likewise, the Complaint specifically details that Defendants received Brand Review Books, approval documents on all unit conversions, flow-charts setting forth all of the ongoing unit conversion deals and detailed internal profit and loss reports. ¶¶ 34, 160, 164, 191.

### 5. Plaintiffs Have Sufficiently Established Scienter as to Each of the Individual Defendants

#### a. <u>Frank Belatti</u>

The Complaint establishes Defendant Belatti's scienter through his detailed knowledge of AFC's accounting manipulations and its true financial condition, his massive insider trading, the executive compensation he received and his position in the Company. Defendant Belatti, AFC's Chief Executive Officer, signed Sarbanes Oxley 906 certifications for AFC's 2nd and 3rd quarter 2002 Form 10-Q, affirming the veracity of the financial information they contained. ¶¶ 8, 112, 127. Additionally, Defendant Belatti: (1) attended Quarterly Business Meetings in which AFC's financial results and condition were discussed; (2) received "Brand Review Books" on at least a quarterly basis, which contained profit and loss statements, comparable sales and conversion reporting for each AFC brand, including the gains attributable to each deal; (3) was the chair of the executive committee; and (4) was a member of the strategic development committee, which was responsible for, *inter alia*, recommendations to the Board of Directors on AFC's strategic plans. ¶¶ 26-27,

34, 164. Through information that Defendant Belatti received in both reports and meetings, he possessed the knowledge or was severely reckless in not possessing the knowledge that his verification of the accuracy of AFC's financial statements was not truthful and that AFC's financial statements were not in conformity with GAAP and would require restatement.

During the Class Period, Defendant Belatti sold 438,000 shares, which constituted approximately 20% of his holdings, for proceeds of $10,682,736.50. ¶ 219. Defendant Belatti's purchases were unusual in timing, as shown by his sales of 36,000 shares during the month and a half before AFC issued its press release of May 24, 2002, in which he described the first quarter 2002 results as "very solid" and emphasized management's confidence in the Company's ability to meet the analyst consensus EPS estimate of $1.72. ¶ 99. Additionally, Defendant Belatti sold 11,000 shares during the two week period surrounding his statement in a July 22, 2002 press release that "AFC has consistently demonstrated its ability to deliver strong sustainable earnings growth, driven by its solid business model and strategy." ¶ 103. He sold 20,000 shares during the month prior to the issuance of the press release on August 13, 2002 (including 1,000 shares on that very same day) reporting financial results for the second quarter of 2002, where he stated that "[w]e continue to demonstrate that we are a sound investment, consistently delivering strong results in a

time of broader market uncertainty. The AFC business model is easy to understand, has straightforward measurements to evaluate execution and provides AFC a strong platform for future growth." ¶¶ 104-06. On that same day, Defendant Belatti stated during a conference call that the Form 10-Q would include the Sarbanes-Oxley certifications and "more than just certifying the report, I'm really pleased with the systems of controls and reporting that we have in place here in the company, and I have great confidence in the transparency of our financial statements." ¶ 109. Defendant Belatti also signed the Form 10-Q, filed on August 14, 2002, indicating that the financial statements were in conformity with GAAP. See ¶ 112. Defendant Belatti's insider sales were also suspicious in amount, considering that he has not sold a single share of AFC stock since the restatement and the end of the Class Period.

As set forth in the Complaint, Defendant Belatti was eligible for an annual bonus of 300% of his base salary up to a maximum of $3,000,000, specifically tied to quarterly and annual performance goals, including stock price appreciation goals. ¶ 227. Defendant Belatti received an incentive cash bonus of $432,500 in 2000, $382,812 in 2001, and $181,750 in 2002. ¶¶ 229-30. He also received other compensation of $18,360 in 2000 as well as 2001. ¶ 229. Additionally, Defendant Belatti was awarded stock options of 33,333 shares in 2000, 60,000 shares in 2001 and 120,000 shares in 2002. ¶¶ 229-230. When viewed in totality, Plaintiffs have

sufficiently established scienter against Defendant Belatti.

### b. **Gerald Wilkins**

The Complaint sufficiently alleges that Defendant Wilkins possessed the requisite scienter as shown by his detailed knowledge and participation in AFC's accounting manipulations and its true financial condition, his egregious insider trading, the executive compensation he received and his position in the Company. Defendant Wilkins, AFC's Chief Financial Officer, signed Sarbanes Oxley 906 certifications for AFC's 2nd and 3rd quarter 2002 Form 10-Q, affirming the veracity of the financial information contained therein. ¶¶ 8, 112, 127. He was described by a former AFC employee as being a hands-on manager and one of the "two guys that made decisions" and who "[was] always concerned with the stock price." ¶ 31. Defendant Wilkins is a seasoned financial professional with significant accounting, auditing and SEC reporting experience; he was trained and employed as a Certified Public Accountant, had an MBA from Stanford and worked as an accountant at a "Big Six" accounting firm prior to joining AFC. ¶ 30. He attended periodic P&L meetings, which took place every four weeks at AFC headquarters, in which AFC's financial results and condition were discussed. ¶ 26. He also received "Brand Review Books" on at least a quarterly basis, which contained profit and loss statements, comparable sales and conversion reporting for each AFC brand, including

- 70 -

the gains attributable to each deal. ¶¶ 30, 34, 164.

In addition to being primarily responsible for AFC's overall financial reporting, Wilkins was directly involved in AFC's conversions as he signed off on all the conversion deals and the accounting for the conversion process "was all up to Gerald Wilkins." ¶¶ 33, 159-61. On the final page of each Approval Document that Wilkins had to sign, the net gain on each sale was clearly listed. ¶ 160. During a December 2001 "family gathering,"[26] Defendant Wilkins outlined AFC's new strategy regarding conversions and committed to having the store conversions add $30 million to AFC's earnings. ¶ 159. He also participated in weekly meetings held in the Peachtree Conference Room at AFC headquarters to make sure the conversions were going through and weekly conference calls to discuss the conversion process and pending transactions. Id.

Defendant Wilkins was aware of the lack of internal control and inventory problems at Seattle Coffee. ¶ 118. In January 2001, to address the inventory problem, he traveled to Seattle "on a few occasions to discuss the matter" but "did not want to spend the money" to replace the Enterprise System inventory management system currently in place. ¶ 132. Through the receipt of information that he received through both reports and meetings, his detailed and intimate knowledge of the

--------

[26] "Family gatherings" were management level meetings held at AFC's headquarters.

accounting for unit conversions, the lack of inventory control relating to Seattle Coffee and his expertise in accounting, Defendant Wilkins possessed the knowledge or was severely reckless in not possessing the knowledge that his verification of the accuracy of AFC's financial statements was not truthful and that AFC's financial statements were not in conformity with GAAP and would require restatement.

During the Class Period, Defendant Wilkins sold 109,000 shares, which constituted approximately 47% of his holdings, for proceeds of $2,921,475. ¶ 219. His purchases were unusual in timing, as he sold 29,000 shares during the four month period prior to the secondary offering for which he was a signatory. ¶ 61. He also sold 40,000 shares within a month of the February 20, 2002 press release and filing of the 2001 10-K, which he signed. ¶¶ 93-94. He also sold 30,000 shares during the two months prior to the issuance of Form 10-Q for the first quarter of 2002, which he signed. ¶ 100. During a conference call on that same day, Defendant Wilkins stated that "looking out at 2002 on a full-year basis, we're looking at record – record performance." ¶ 101. Defendant Wilkins's sales were also suspicious in amount, especially when considering that he has not sold a single share of AFC stock since the restatement and the end of the Class Period.

Defendant Wilkins was eligible for an annual bonus of 300% of his base salary up to $3,000,000, specifically tied to quarterly and annual performance goals,

including stock price appreciation goals. ¶ 227. Defendant Wilkins received an incentive cash bonus of $200,000 in 2000 and $362,359 in 2001. ¶¶ 229. He also received other compensation of $5,510 in 2000 and $22,414 in 2001. Id. Defendant Wilkins was awarded stock options of 20,000 shares in 2000 and 40,531 shares in 2001. Id. When viewed in totality, Plaintiffs have sufficiently established scienter against Defendant Wilkins.

###      c.      **Dick Holbrook**

The Complaint establishes Defendant Holbrook's scienter through his detailed knowledge of AFC's accounting manipulations and its true financial condition, his massive insider trading, the executive compensation he received and his position in the Company. Defendant Holbrook, AFC's President and Chief Operating Officer, was described by a former AFC employee as being a hands-on manager and one of the "two guys that made decisions" and who "[was] always concerned with the stock price." ¶ 31. Defendant Holbrook's scienter is shown by his: (1) attendance at periodic P&L meetings, which took place every four weeks at AFC headquarters, in which AFC's financial results and condition were discussed; (2) membership on the strategic development committee, which is responsible for recommendations to the Board of Directors with respect to AFC's strategic plans; and (3) receipt of "Brand Review Books" on at least a quarterly basis, which contained profit and loss

statements, comparable sales and conversion reporting for each AFC brand, including the gains attributable to each deal. ¶¶ 26, 34, 164. Through the information he received in both reports and meetings, Plaintiffs have shown that Defendant Holbrook knew or was severely reckless in disregarding that AFC's financial statements were not in conformity with GAAP and would require restatement.

During the Class Period, Defendant Holbrook sold 311,740 shares, which constituted 32% of his holdings, for proceeds of $7,898,346. ¶ 219. His purchases were unusual in timing as he sold 40,000 shares during the three month period before the secondary offering for which he was a signatory. ¶ 61. His insider sales were also suspicious in amount, especially when considering that he has not sold a single share of AFC stock since the restatement and the end of the Class Period.

Defendant Holbrook was eligible for an annual bonus of 300% of his base salary up to $3,000,000, specifically tied to quarterly and annual performance goals, including stock price appreciation goals. ¶ 227. In 2000 and 2001, he received incentive cash bonuses of $245,000 and $285,812, respectively. ¶¶ 229. He also received other compensation of $6,935 in 2000 as well as 2001. Id. Defendant Holbrook was awarded stock options of 26,666 shares in 2000 and 46,666 shares in 2001. Id. When viewed in totality, Plaintiffs have sufficiently established scienter against Defendant Holbrook.

### d.    <u>Kelvin Pennington</u>

The Complaint sufficiently alleges that Defendant Pennington possessed the requisite scienter through his detailed knowledge of AFC's accounting manipulations and its true financial condition, his egregious insider trading and his position in the Company. Defendant Pennington was a member of the audit committee, which reviewed and approved AFC's accounting policies and reporting practices, internal auditing and internal controls and compliance with AFC's business conduct policies. ¶¶ 40, 46, 222-23. The Audit Committee met at least four times during 2001 and was charged with "oversee[ing] the Company's financial reporting process on behalf of the Board of Directors." ¶ 222. According to AFC's 2002 Proxy Statement, Defendant Pennington (1) reviewed and discussed the audited financial statements with AFC's management, (2) discussed the financial statements with Arthur Andersen LLP as required by SAS No. 61, (3) met with Arthur Andersen and AFC management to review the scope of the proposed audit for 2001 and the audit procedures to be utilized, (4) reviewed with Arthur Andersen AFC's financial management, the adequacy and effectiveness of AFC's accounting and financial controls, and (5) reviewed with management and the auditors the financial information contained in AFC's 10-Qs prior to filing, AFC's earnings announcements prior to release, as well as the annual consolidated financial statements and related

- 75 -

footnotes. Id.

Furthermore, as early as December 2001, the internal audit department held a meeting to discuss the lack of internal controls at Seattle Coffee. ¶ 118. During the summer of 2002, an AFC internal audit department meeting discussed AFC's issuance of financial statements that did not accurately depict the financial condition of Seattle Coffee and that Seattle Coffee had a "major inventory issue." Id. Defendant Pennington was aware of this issue as a result of his membership on AFC's audit committee. Id. Through his membership on the audit committee, which had the affirmative responsibility for verifying the accuracy of AFC's financial statements, and from information that he received in both reports and meetings, Plaintiffs have shown that Defendant Pennington knew or was severely reckless in disregarding that AFC's financial statements were not in conformity with GAAP and would require restatement.

During the Class Period, Defendant Pennington, through his company Penman, sold 1,574,637 shares, which constituted 100% of his holdings, for proceeds of $35,084,491.05. ¶ 219. His purchases were unusual in timing as he sold 736,000 shares during the secondary offering for which he was a signatory. ¶ 61. Defendant Pennington sold 868,637 shares, liquidating his remaining position in AFC stock, less than two months before the January 16, 2003 press release where Defendant Belatti

emphasized AFC's stability despite a challenging economy. ¶ 134. Defendant Pennington's sales were also suspicious in amount, especially when considering that Defendant Pennington liquidated his holdings of AFC stock while the Company's stock price was artificially inflated as a result of the dissemination of false and misleading statements.

Defendant Pennington contends that his status as an Outside Director is insufficient to establish scienter. Dir. Def. Br. at 22-25. It is not Defendant Pennington's status but his actions that establish his scienter. Defendant relies chiefly on the decision in Enron Corp.. The portion of the court's decision exonerating the outside directors and cited by Defendant Pennington was based on two factors: (1) the Company treasurer's failure to provide truthful information to the directors; and (2) the absence of any unusual stock sales by the directors. 258 F.Supp.2d at 638. Here, in stark contrast, Defendant Pennington was privy to the truth regarding AFC's financial condition because of his membership on the Audit Committee, and made enormous stock sales as a result. Unlike in Enron, there is no excuse that he was misled by AFC's treasurer. These actions establish scienter, whatever Pennington's status. See Stevelman, 174 F. 3d at 85; In re JWP Inc. Sec. Litig., 928 F. Supp. 1239, 1256-57 (S.D.N.Y. 1996) (audit committee members).

In In re Worldcom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 419 (S.D. N.Y. 2003),

- 77 -

also relied on by Defendant Pennington, sales of tens of millions of dollars of stock, before revelations of fraud and amounting to a significant portion of an outside director's holdings, were sufficient to create a strong inference of scienter. Here , Defendant Pennington sold 100% of his holdings, reaping $35 million.

When viewed in totality, Plaintiffs have sufficiently established scienter against Defendant Pennington.

**D.    The Complaint Adequately Alleges Liability under Section 20(A) for Contemporaneous Trading**

Contrary to Defendants' assertions, Plaintiffs have sufficiently alleged claims for disgorgement of insider trading proceeds pursuant to Section 20A of the Exchange Act. As discussed at length in Sections III B&C of this brief, Plaintiffs have alleged predicate violations of the Exchange Act against all insider trading Defendants.    The only remaining issue is whether Plaintiffs' allegations of "contemporaneous" trading pass muster; under the majority view of the contemporaneity requirement, as well as the legislative history of Section 20A, Plaintiffs' allegation of Local 132's December 7, 2001 purchase of AFC stock, just one day after the alleged insider sales, is more than sufficient to meet this statutory condition.

Defendants concede, as they must, that their "same day" interpretation of the contemporaneous transaction requirement is not the unanimous view of courts that

have addressed the issue. See AFC Def. Br. at 38-39. Indeed, the majority view appears to be that trades occurring within a few days are sufficiently "contemporaneous" under the statute. See, e.g., Enron Corp., 258 F. Supp. 2d at 600 (trades within two or three days are contemporaneous); In re Engineering Animation Sec. Litig., 110 F. Supp. 1183, 1196 (S.D. Iowa 2000) (trades within three days are contemporaneous); Oxford Health, 187 F.R.D. at 144 (trades within five days are contemporaneous); In re Cypress Semiconductor Sec. Litig., 836 F. Supp. 711, 714 (N.D. Cal. 1993) (trades within five days are contemporaneous).

Furthermore, the legislative history[27] of Section 20A shows that a few days' separation between trades satisfies the contemporaneity requirement. At the time of its enactment, Congress sought to codify the judicially-fashioned contemporaneity requirement for private actions for insider trading under Rule 10b-5. See H.R. Rep. No. 910, 100th Cong., 2d Sess. 27 (1988), reprinted in 1988 U.S.S.C.A.N. 6043, 6064. The House report cited three cases from the Second Circuit as examples of the proper application of the contemporaneity requirement; one held that a month was too

---

[27] Because the statute does not define "contemporaneous," Plaintiffs contend that the term is somewhat ambiguous, and accordingly, resort to its legislative history as an aid in determining its meaning is appropriate. See, e.g., United States v. Pringle, 350 F.3d 1172, 1180 n. 11 (11th Cir. 2003) ("When a statute is vague or ambiguous, other interpretive tools may be used, including an examination of the act's purpose and of its legislative history.").

long, but two held that trades within a few days were sufficient.  See, e.g., Wilson v. Comtech Telecommunications Corp., 648 F.2d 88, 94-95 (2nd Cir. 1981) (a month is too long); Shapiro v. Merrill, Lynch, Fenner & Smith, 495 F.2d 228 (2nd Cir. 1974) (a few days separation is still sufficient).  Accordingly, Congress did not intend to impose the onerous requirement of same-day trading in order recover for the harm resulting from trading at an informational disadvantage with insiders.

### E.    Plaintiffs Have Shown that Liability Under Section 11 Has Been Established as to All Defendants

#### 1.    The Securities Act is Intended to Protect Investors Through Strict Liability

Following the collapse of the financial markets in the United States in October 1929, Congress enacted the Securities Act of 1933 (the "Securities Act").  15 U.S.C. §§ 77a-77bbbb.  The purpose of Section 11 of the Securities Act is to ensure compliance "with the disclosure provisions of the Securities Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering."  Herman & MacLean v. Huddleston, 459 U.S. 375, 381-82 (1983).  The Securities Act "was designed to provide investors with full disclosure of material information concerning public offerings . . . ."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 195 (1976); see also Affiliated Ute Citizens v. United States, 406 U.S. 128, 151 (1972) ("[T]he fundamental purpose of the . . . Securities Act was to substitute a

policy of full disclosure for the philosophy of *caveat emptor*. . . .”); Basic, 485 U.S. at 230 (same).

To state a claim under Section 11 of the Securities Act, a plaintiff need only show the purchase of a security pursuant to a registered offering and that the registration statement contains a material misstatement or omission of material fact. Huddleston, 459 U.S. at 382. As the Underwriter Defendants concede, scienter is not, and has never been, an element of a Section 11 claim. See Underwriter Defendants' Memorandum of Law in Support of Their Motion to Dismiss (“Und. Def. Br.”) at 5; Id.; see also In re Ins. Mgmt. Solutions Group Sec. Litig., No. 8:00CV2013T26MAP, 2001 WL 34106903, at *11-12 (M.D. Fla. July 11, 2001). When enacting the PSLRA in 1995, Congress left intact the pleading requirements under the Securities Act, and therefore the elements of a prima facie case under Section 11 remain as they were in 1933.

### 2.     This Court Should Not Adopt the “Sound in Fraud” Framework Proposed by Defendants, Nor Should it Apply Rule 9(b) to the Securities Act Claims

This Court has previously determined that the “sound in fraud” test and Rule 9(b) analysis is not applicable to claims brought under Section 11. Premiere Tech I, slip op at 22 n.6. The Court reasoned that the prospectus at issue contained a material omission needed to make the publicly disseminated financial statements that were

part of the registration materials not false and misleading and that plaintiffs expressly stated that the claim asserted under Section 11 did not incorporate any allegations of intentional or reckless misconduct. See id. The Eleventh Circuit also recognizes that "[a]lthough there is some overlap between Section 10(b) and Section 11, the provisions 'involve distinct causes of action and were intended to address different types of wrongdoing.'" Kilpatrick v. J.C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987) (citing Huddleston, 459 U.S. 375). Furthermore, the sound in fraud test should be rejected as: 1) the test is a relatively recent judicial creation based on flawed decisions and reasoning; 2) the courts that have recognized these flaws have not used the sound in fraud test to dismiss Section 11 claims; and 3) the current trend, especially when courts have carefully analyzed the underpinnings and origins of the test, is to reject any application of the sound in fraud test.

The sound in fraud test is a very recent phenomena in light of the fact that Section 11 was adopted in 1933. See Brian Murray and Donald J. Wallace, You Shouldn't Be Required to Plead More Than You Have to Prove, 53 Baylor L. Rev 783, 795-96 (2001)(attached as Ex. F)(the "Baylor article at ___"). In fact, the test can only trace its roots in the Circuit Courts back to Sears v. Likens, 912 F.2d 889 (7th Cir. 1990). Although Sears has been commonly cited in support of the sound in fraud test, the decision never mentions whether the complaint sounded in fraud, nor

was there a registration statement or prospectus at issue in that case. The court merely mentioned, in dictum, that the plaintiffs had failed to satisfy Rule 9(b) and offered no justification for why Securities Act claims should be subject to Rule 9(b), nor stated that the plaintiffs had alleged fraud in their Securities Act claims. <u>Id.</u> at 893. The next case to address this issue was <u>Shapiro v. UJB Financial Corp.</u>, 964 F.2d 272, 288 (3rd Cir. 1992), in which the plaintiffs had incorporated all the Section 10(b) factual allegations into their Securities Act claims, and repeatedly discussed the defendant's intentional, knowing, and reckless misrepresentations. As a result, the court held the complaint was "devoid of allegations that defendants acted negligently in violating sections 11 and 12(2)."[28] <u>Id.</u>

"From these modest beginnings, in which one circuit court was searching for a hint of negligence to avoid applying Rule 9(b) to a Securities Act claim, and one circuit court never directly addressing Rule 9(b)'s application to the Securities Act, <u>Sears</u> and <u>Shapiro</u> have created a snow ball effect where now some courts search for a hint of fraud in order to apply Rule 9(b)." (Baylor article at 797). In fact, <u>In re Stac Elec.</u>, 89 F. 3d 1405 (9th Cir. 1996), upon which Defendants rely, premises its holding upon <u>Sears</u> and <u>Shapiro</u>. "Upon these shaky foundations, a small body of

---

[28] In doing so, the court ignored the pleading requirements of the Securities Act, which do not require allegations of negligence.

case law has developed which applies Rule 9(b) to Securities Act claims. None of these cases scrutinize the cases on which they base their holdings. In fact, in most instances they go well beyond the holdings of the cases cited." (Baylor article at 798-99).

Courts today now recognize that "[w]hile some courts have accepted [the sound in fraud] argument, most have not because nothing in Section 11 requires a plaintiff to prove the defendant committed fraud." In re IPO Sec. Litig., 241 F. Supp. 2d 281, 338 (S.D.N.Y. 2003)(collecting cases that have refused to adopt the sound in fraud test); see also Baylor article at n. 38 (collecting same). Rule 9(b) requires a plaintiff to plead "the circumstances constituting fraud . . . with particularity." IPO, 241 F. Supp.2d at 339. "Because there is no need to prove fraud in a Section 11 claim, there is no need to satisfy Rule 9(b)," and "[b]ecause a plaintiff cannot be required to plead something it need not prove, [the In re IPO court] join[ed] the majority of courts in the [Southern District of New York] that have concluded that Rule 9(b) does not apply to Section 11 claims." Id.

Defendants attempt to simply gloss the issue with the conclusory argument that "most circuit courts agree that Rule 9(b) applies" to Section 11 claims. See AFC Def. Br. at 40; Dir. Def. Br. at 18, n. 9. The defendants in IPO lodged this same argument, but the court there found their position to be "somewhat exaggerated." 241 F. Supp.

- 84 -

2d at 339. In any event, IPO recognized that the Court's statement in Sears was "pure dictum," as explained above, and that district courts within the Seventh Circuit have refused to apply Sears to Section 11 claims on this basis. Id. at 339, n.4 (citing district cases). The court also recognized that, "in recent years the Fifth and Third Circuits have taken steps to substantially undercut the application of the sound in fraud doctrine." Id. (citations omitted). Finally, it recognized that the Ninth Circuit, which earlier had adopted the sound in fraud argument in the Stac decision, "has now signaled its desire to move away from rigid application of the sound in fraud doctrine." Id. at 340 (referring to Vess v. Ciba-Geigy Corp., 317 F.3d 1097, 1102-05 (9th Cir. 2003), which notes that the Ninth Circuit "has not analyzed the application of Rule 9(b) in a case where fraud is not an essential element of the claim, and where allegations of both fraudulent and non-fraudulent conduct are made in the complaint.").

Defendants' reliance upon Rombach v. Chang, 355 F.3d 164, 171 (2nd Cir. 2004), is misplaced. AFC Def. Br. at 40-42. The Court's reasoning in Rombach is flawed as it almost blindly relies upon Sears and Shapiro in adopting the test. See id. at 170. Additionally, the Court's decision cuts in favor of Plaintiffs with respect to the Director and Underwriter Defendants as that court found that the "duty to make a reasonable and diligent investigation" could not be subject to the sound in fraud