test. Id. at 178.

This Court should follow the majority of courts that have rejected the sound in fraud argument, such as the Eighth Circuit, which has categorically held that "the particularity requirement of Rule 9(b) does not apply to claims under § 11 of the Securities Act, because proof of fraud or mistake is not a prerequisite to establishing liability under § 11," and a "pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in Fed. R. Civ. P. 8(b)." NationsMart, 130 F.3d at 314-15.[29]

### 3. Even if this Court Does Adopt the "Sound in Fraud" Test, Plaintiffs' Securities Act Claims Are Not Based on Fraud, and Therefore Should Not be Dismissed

Even if this Court adopts the sound in fraud test, the Section 11 claim should still stand as the Complaint adequately alleges all necessary elements of such a claim. None of the Section 11 allegations allege fraud nor are they intended to do so as

---

[29] The Director and Underwriter Defendants also attempt to interject an argument that their alleged reasonable reliance on the expert opinion of AFC's external auditor constitutes due diligence under Section 11(c)(3) is a basis for dismissing the Complaint. Dir. Def. Br. at 16-17; Und. Def. Br. at 4 n.2. This argument should not be considered as it is not properly adjudicated on a motion to dismiss. Enron Corp., 258 F. Supp. 2d at 639; Global Crossing, 313 F.Supp.2d at 211; Hamilton Bankcorp, 194 F.Supp.2d at 1357.

evidenced by Plaintiffs' explicit statement that their Securities Act claims "specifically exclude any allegations of knowledge or scienter." ¶ 66. In addition, not only does the Complaint "disclaim" averments of fraud, but Plaintiffs physically separated the Securities Act claims from the Exchange Act claims. Section IV(A) of the Complaint contains the Securities Act claims, which stand alone in paragraphs 49-64. Immediately following these paragraphs are the Securities Act counts, which are contained in paragraphs 65-73. (Counts I & II).

Despite Plaintiffs' careful separation of the two claims, Defendants craft various arguments in an attempt to forcefully press a square fraud allegation peg into a round Section 11 hole. First, they claim that the Section 11 claim "overlaps entirely" with [the] Section 10(b) claim because the Complaint, in ¶ 57, "incorporates" the restatement allegations into the Section 11 claim. While it is true that the Complaint refers to the restatement, Defendants entirely miss the point. The restatement is not a false statement, but rather a revelation of the truth. Plaintiffs merely proffer the restatement as evidence that the Prospectus contained erroneous information. In fact, the restatement is an explicit concession that this indeed was the case.

The AFC Defendants argue that Plaintiffs' Section 11 claim is based on "accounting errors," and attempt to show that Plaintiffs' Section 11 claims are based

on fraud by citing to five specific complaint paragraphs as alleged support. AFC Def. Br. at 41-42. However, the paragraphs they cite to, ¶¶ 3-6, 147-48, are not contained within the Section 11 part, which is only in paragraphs 49-73, and therefore their argument fails.

The Outside Directors and the Underwriters attack from a different front, but the argument is equally meritless. They claim that the Complaint's periodic reference to "all Defendants" in certain places necessarily indicates that the Section 11 claim sounds in fraud. Und. Def. Br. at 2, 4, 12-14; Dir. Def. Br. at 19-20. Not one of the paragraphs cited by these Defendants is contained in the Section 11 part of the Complaint. In any event, Plaintiffs specifically enumerate the Section 11 Defendants and the violations for which they are liable. ¶¶ 53, 61, Counts I & II, & ¶¶ 72-73.

Defendants also argue that Plaintiffs' disclaimer of fraud in Complaint ¶ 66 is of no effect. Und. Def. Br. at 10-11; Dir. Def. Br. at 7-8; AFC Def. Br. at 42. This is in direct contradiction to the Court's previous ruling. Premiere Tech I, slip op. at 22, n.6. See also Lone Star Ladies Inv. Club v. Schlotzsky's Inc., 238 F.3d 363, 369 (5th Cir. 2001) (holding that because a complaint "expressly does not assert that defendants are liable for fraudulent or intentional conduct and disavows and disclaims any allegation of fraud" under Section 11, "those claims do not 'sound in fraud' and cannot be dismissed for failure to satisfy Rule 9(b)"); Nationsmart, 130

F.3d at 315 (Rule 9(b) not applicable because the complaint expressly disavows any claim of fraud in connection with the Section 11 violation); In re WorldCom, Inc. Sec. Litig., 2004 U.S. Dist Lexis 11696, *8, n.4 (S.D.N.Y. June 29, 2004)(same).

Finally, Defendants argue that, because Plaintiffs used the phrases or words such as "materially false and misleading," "misleading," and "false and materially misrepresented" within the Section 11 portion of the Amended Complaint, the claim "is classically associated with fraud." See AFC Def. Br. at 41-42; Dir. Def. Br. at 7-8; Und. Def. Br. at 10. Section 11 specifically allows civil claims if any part of the registration statement, when such part became effective, contained an *untrue statement* of a *material* fact or omitted to state a *material fact* required to be stated therein or necessary to make the statements therein not *misleading*. 15 U.S.C. § 77k(a). It would be nonsensical for Plaintiffs' use of the exact words contained in the statute to convert a strict liability case to fraud.[30]

---

[30]  Even if the Court were to adopt and apply the sound in fraud test and determine that certain aspects of the Section 11 claim were covered thereby, those aspects "would be mere surplusage. The only consequence of a holding that Rule 9(b) is violated with respect to a § 11 claim would be that any allegations of fraud would be stripped from the claim. The allegations of innocent or negligent misrepresentation, which are at the heart of a § 11 claim, would survive." Nationsmart, 130 F.3d at 315. "A plaintiffs' case should [not be] dismissed because they alleged more than was necessary to recover under § 11 of the Securities Act." Id.

### 4.    Plaintiffs Have Standing to Assert a Section 11 Claim

Defendants' argument that Plaintiff Savchick has no claim for damages as a matter of law is wholly misguided and founded upon a gross mischaracterization of 15 U.S.C. § 77k(e), as well as a misreading of extant case law.  As alleged in the Complaint, Savchick purchased his shares at $17.00 pursuant to AFC's IPO; he continues to hold these shares. 15 U.S.C. § 77k(e) provides, in pertinent part:

> The suit authorized under [Section 11] may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof at the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3) the price at which such security *shall have been disposed of after suit but before judgment* if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought . . . .

(emphasis added).  The crucial issues here are (1) the meaning of the phrase "at the time such suit was brought;" and (2) operation of the phrase "shall have been disposed of after suit but before judgment" (which Defendants willfully omitted in their characterization of the statute).

Defendants argue that, because the price of AFC stock was $23.00 on the date the amended complaint in this case was filed, Plaintiff Savchick has suffered no damages as a matter of law, pursuant to operation of the first prong of 15 U.S.C. §

- 90 -

77k(e). Dir. Def. Br. at 15. This argument is misplaced because it relies on the premise that the phrase "at the time such suit was brought" refers to the date of the amended complaint, not the date on which the initial complaint in this case was filed. The principal case cited by Defendants, Alpern v. Utilicorp United, Inc., 84 F.3d 1525 (8th Cir. 1996), squarely addresses this issue and comes down in favor of Plaintiffs. The Alpern court expressly held that, pursuant to Fed. R. Civ. P. 15(c)(2), an amended complaint containing the first assertion of a Section 11 claim "relates back" to the original complaint for the purpose of determining the date by which Section 11 damages are measured. See 84 F.3d at 1541-44. See also Grossman v. Waste Management, 589 F. Supp. 395 (N.D. Ill. 1984); Beecher v. Able, 435 F. Supp. 397 (S.D.N.Y. 1975).

Here, as in Alpern, on the date the original complaint in this case was filed (March 25, 2003), the price of AFC stock was well below the purchase price (it closed at $13.40, $3.60 lower than the $17.00 offering price). Because the Section 11 claim asserted in this case "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[,]" the appropriate measure of damages for Plaintiff Savchick's claim is the difference between the purchase price and the price of the stock on March 25, 2003. Fed. R. Civ. P. 15(c)(2); 84 F.3d at 1541-44.

Even if the Court were to determine that the Section 11 claim does not relate back to the filing of the original complaint, Plaintiffs still possess standing to assert a Section 11 claim. The Court in <u>Merzin v. Provident Fin. Group, Inc.</u>, 311 F. Supp. 2d 674 (S.D. Ohio 2004) took a slightly different approach than the Court in <u>Alpern</u>. In <u>Merzin</u>, the Court found that the date when the plaintiff "became a part of the suit" is the proper determinant for judging the value at the time of suit under 15 U.S.C. § 77k(e)(1). 311 F. Supp. 2d at 686. As Plaintiff Savchick filed a motion to be appointed lead plaintiff in this action, he "became a part of the suit" on that date, May 27, 2003. On that date, the price of the stock closed at $16.46, which is less than the amount that Plaintiff Savchick paid for his AFC stock in the initial public offering. As a result, Plaintiff Savchick suffered damages and possesses standing to assert a claim under Section 11.

Tacitly acknowledging the foregoing argument, Defendants take the "fall-back" position that, because the price of the stock has recovered to a level above the initial offering price, Plaintiff Savchick suffered no damages as a matter of law under 15 U.S.C. § 77k(e)(3). Dir. Def. Br. at 15-16. Defendants' argument does violence to the plain, unequivocal language of the statute, which requires a disposition of the plaintiff's shares prior to judgment in order to trigger application of the third prong, quoted above.

Aside from constituting a complete departure from the plain language of the statute, Defendants' interpretation is nonsensical. Because the price of a stock may fluctuate prior to judgment, the existence of a plaintiff's standing to assert a claim for Section 11 damages would potentially be in flux during the case, subject to attack at any point in time where the stock may briefly rise above the offering price. The only sensible reading of 15 U.S.C. § 77k(e) is that, where a plaintiff holds his shares, the only measure of damages is the difference between the purchase price and the price of the stock at the time the suit is brought (by virtue of the "original pleading"). At best, disposition of this issue is premature at this stage of the litigation. Accordingly, Defendants' argument is untenable and should be rejected.

### 5.    Plaintiffs Have Properly Asserted Securities Act Claims Against Defendants Frankel and Farrar

#### a.    Defendant Farrar

Defendant Farrar's resignation just prior to the effective date of the IPO prospectus does not negate his liability for violations of Sections 11 and 15. According to 15 U.S.C. § 77k(a)(2), any person who was a director **at the time of the filing of the registration statement** for which liability is asserted can be held liable for any untrue statement or omission contained in the registration statement at the

time it became effective.[31]

Defendants interpret 15 U.S.C. §77k to require a defendant to be employed in his controlling role when the registration statement is made effective, Dir. Def. Br. at 14, but this reading injects an additional requirement that was not intended. The "effective" requirement of 15 U.S.C. §77k(a) does not exclude from liability those who signed an earlier registration statement, but rather, it excludes those statements that are not made effective. By triggering liability for "every person who signed the registration statement" when it becomes effective, the statute provides insulation to filers while the SEC determines whether a document meets the standards to be made effective. This prevents the imposition of liability for filing errors until the SEC has had an opportunity to review the registration statement. 15 U.S.C. § 77k(a)(2) further provides that "Every person who was a director of (or person performing similar

---

[31] Section 15 U.S.C. § 77k (a) states in relevant part:
   In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--
   (1) every person **who signed** the registration statement;
   (2) every person who was a director of (or person performing similar functions) or partner in, the issuer **at the time of the filing of the part of the registration statement with respect to which his liability is asserted**;
   (3) every person who, with his consent, **is named in the registration statement as being or about to become a director**, person performing similar functions, or partner;

functions) or partner in, the issuer **at the time of the filing of the part of the registration statement with respect to which his liability is asserted.**" (emphasis added).

Defendant Farrar signed the initial registration statement (S-1) filed on December 22, 2000, and the first amendment (S-1/A) filed on January 22, 2001. The original S-1 that Farrar signed as director was the registration statement that contained the false and misleading statements.[32]   Because the subsequent amendments to the registration statement did not materially alter or amend the financial statements as contained in the original S-1, when the registration statement became effective on March 2, 2001, Farrar became liable under Section 11.[33]  Having adequately asserted Section 11 liability against Defendant Farrar, Plaintiffs are proper

_____

[32] "Rule 430 requires that the preliminary prospectus be filed as part of the registration statement and contain **substantially the information** required to be included in the full prospectus under Section 10(a)," with exceptions. *2-7A Federal Securities Act of 1933 § 7A.05.*(emphasis added)

[33] Furthermore, courts have even imposed liability on a new director who signed a registration statement of which he has little knowledge to the content.  In Escott v. Barchris Constr. Corp., 283 F. Supp. 643, 687-688 (S.D.N.Y. 1968), the court stated that "section 11 imposes liability in the first instance upon a director, no matter how new he is. He is presumed to know his responsibility when he becomes a director." Although the facts of this case are the inverse of the facts here, under this construction of Section 11, a director who served in that role for years, signed the initial prospectus, only to resign the month before the issuing of the final IPO prospectus, would be liable for the false and misleading statements and omissions it contained.

in also asserting control person liability against him for the reasons stated above.

### b.    <u>Defendant Frankel</u>

Additionally, Defendant Frankel argues that he is not a proper Section 11 Defendant because he was not a director at the time of the IPO and did not sign the registration statement that became effective on March 2, 2001. AFC Def. Br. at 43. Although Defendant Frankel resigned from the board of directors and from his positions as general counsel and secretary just prior to the effective date of the IPO prospectus, he remained Executive Vice President of AFC.

Furthermore, like Defendant Farrar, his resignation from his director position does not negate his liability for violations of Sections 11 and 15. Defendant Frankel signed the initial registration statement (S-1) filed December 22, 2000 and the first amendment (S-1/A) filed on January 22, 2001. As discussed above, as a director at the time of the filing of the registration statement for which liability is asserted, Frankel can be held liable for any untrue statement or omission contained in the registration statement when it became effective. 15 U.S.C. § 77K(a)(2). The original S-1 that Frankel signed as director, general counsel, secretary and Executive Vice President on December 22, 2000, contained the false and misleading statements.[34]

_____

[34] "Rule 430 requires that the preliminary prospectus be filed as part of the registration statement and contain **substantially the information** required to be

When this false content became effective, Defendant Frankel also became liable under Section 11. Furthermore, as a result of Defendant Frankel's position and exertion of control over AFC's activities, as discussed in more detail above, Plaintiffs are also proper in asserting control person liability against Defendant Frankel.

## F.    The Complaint Sufficiently Pleads Control Person Liability Under Both Sections 15 and 20(a)

### 1.    The Standard in the Eleventh Circuit

In the Eleventh Circuit, to plead control person liability under Section 15 of the Securities Act and Section 20(a) of the Exchange Act, a plaintiff need only allege that the defendant had the power to control (1) the general affairs of the primary violator; and (2) the specific corporate policy that resulted in the primary violation. See, e.g., Brown v. Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996)[35]; JDN Realty, 182 F. Supp. 2d at 1241. The regulations promulgated thereunder define control to be either the direct or indirect possession of the power to direct or cause the direction of the management and policies of a person. Specifically, "control" is

included in the full prospectus under Section 10(a)," with exceptions. *2-7A Federal Securities Act of 1933 § 7A.05.* (emphasis added).

[35] The court in Brown announced the test for control person liability with respect to § 20a of the Exchange Act. The control person analyses under § 15 of the Securities Act and § 20a of the Exchange Act, however, are identical and, therefore, the two sections are given the same interpretation. Pharo v. Smith, 621 F.2d 656, 673 (5th Cir. 1980), amended by 625 F.2d 1226 (5th Cir. 1980); Unicapital Corp, 149 F. Supp. 2d at 1367 n.22.

the possession, direct or indirect, of the power to direct or cause the direction of management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 230.405.

### 2.    The Complaint Adequately Alleges Control Person Claims Against the Individual Defendants

The Individual Defendants' active participation in AFC's day-to-day affairs, and their direct involvement in the preparation, review, execution and/or dissemination of the misrepresentations alleged throughout the Complaint strongly suggest that their conduct was more than mere negligence. See In re Datastream Sys., No. 6:99-0088-13, 2000 WL 33176025, at *4 (D.S.C. Jan. 27, 2000). The Individual Defendants possessed the power to control AFC by reason of, inter alia, their:

(a)    positions as executive officers and/or directors of AFC and their participation in the day-to-day affairs of AFC (See ¶¶ 26-27, 30-31, 33-34, 46, 118, 132, 150, 159-61, 222-23, 237);

(b)    signing of AFC's SEC filings, including the Prospectuses, Registration Statements, the quarterly and annual reports and Sarbanes Oxley 906 certifications (See ¶¶ 8, 53, 61, 75, 82, 87, 90, 94, 100, 112, 127-28); and

(c)    preparation, review, execution and dissemination of many, if not all, of the press releases issued by AFC (See ¶¶ 74, 79-81, 85-86, 92-93, 99, 103-07, 119-20, 123, 134).

Accordingly, Plaintiffs' allegations are sufficient to state a cause of action for control person liability. Miller Indus., 12 F. Supp. 2d at 1333 (citing Brown, 84 F.3d

at 396).

### 3.    The Complaint Adequately Alleges Control Person Claims Against Defendant Frankel

Despite Defendant Frankel's argument that the Court should dismiss the controlling person claims because Plaintiffs have not sufficiently pled that he had the ability to control AFC and its accounting policies, AFC Def. Br. at 44-45, the Complaint establishes that Defendant Frankel's involvement is sufficient to plead a controlling person claim against him under Section 15.    As set forth in the Complaint, Defendant Frankel was an Executive Vice President, Secretary and General Counsel of AFC, served as a Director of the Company from 1992 to February 2001 and signed the Registration Statements and Prospectus filed in connection with the IPO. ¶ 36. Additionally, Defendant Frankel sold a significant amount of stock, namely 172,500 shares, or approximately 20% of his AFC holdings, during the Class Period. ¶¶ 90, 219. Furthermore, in 2000, Defendant Frankel received $332,885 in salary, $179,300 in bonuses, $14,495 in other compensation and a stock option reward of 20,000 shares. ¶ 229. Likewise, in 2001, Defendant Frankel received $330,000 in salary, $155,941 in bonuses, $123,995 in other compensation and a stock option award of 16,666 shares. Id.

Congress recognized that it would be difficult, if not impossible, to enumerate or anticipate the many ways in which actual control may be exercised. See House

Rep. No. 1383, 73 Cong. 2nd Sess. 26 (1934). In determining whether controlling person liability has been established, the Court's "focus turns on whether the defendant, acting alone or as a member of an identifiable group, had the power or influence to direct significant aspects of the management of the corporation." In re Splash Tech. Holdings, Inc. Sec. Litig., No. C99-00109, 2000 WL 1727405, at * 16 (N.D. Cal. Sept. 29, 2000). It is patently clear that Defendant Frankel had this power and influence because he had an employment agreement with AFC that explicitly provided that, upon his termination as an employee of the Company, he would become engaged as an independent contractor to purportedly provide consultation and advice to the CEO, at a salary of $350,000 per year for a period of ten years. ¶ 167. As a result, Defendant Frankel's reliance on Lilley v. Charren, 936 F. Supp. 708, 716 (C.D. Cal. 1996), AFC Def. Br. at 44, is inapposite.

### 4. The Complaint Adequately Alleges Control Person Claims Against Defendants Freeman Spogli and Penman

The actions and control exerted by Defendants Freeman Spogli and Penman clearly demonstrate that they should be held liable as control persons under Sections 15 and 20(a). The only support these Defendants proffer is Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001), which is easily distinguishable. First, Defendant Freeman Spogli held 47.8% of the interest in AFC at the time of the IPO, nearly a majority position and larger than the 39% held by the defendant in Theoharous.

Secondly, the <u>Theoharous</u> plaintiffs primarily relied on the interest held and an agreement that guaranteed the election of a minority block of four of the nine directorships to demonstrate "controlling person" liability. <u>Id.</u> In contrast, a majority of the AFC directors were representatives of Defendant Freeman Spogli (six out of eleven), thereby giving it control of the board. ¶ 42. Furthermore, Plaintiffs do not rely on this interest alone to support their allegations, but assert additional facts demonstrating control by Defendants Freeman Spogli and Penman.

For instance, in addition to having a majority of directors on AFC's Board, Defendant Freeman Spogli also represented the controlling majority of AFC's executive committee, which was empowered to act on behalf of the Board of Directors. ¶42. Defendant John M. Roth, a director of AFC since April 1996 and general partner of Defendant Freeman Spogli, served on the executive committee and the people services committee and signed the registration statements and prospectuses in connection with both AFC offerings. ¶ 43. Defendant Ronald P. Spogli, a director of AFC since April 1996 and a founding principal of Defendant Freeman Spogli, served on the executive committee and signed the registration statements and prospectuses in connection with both AFC offerings. ¶ 44. Through its stock ownership and the high-level position of their partners within AFC, Defendant Freeman Spogli had intimate and detailed knowledge regarding AFC's accounting

manipulations. ¶ 244.

Additionally, Defendant Penman does not dispute that it has undertaken the affirmative obligation, as stated through its management company, to "remain actively involved in companies it invests in," and "actively monitors the performance of its portfolio companies through dialogue with senior management and monthly and/or quarterly financial review of operating performance." ¶ 46 n. 5. Defendant Pennington, who has been a director of AFC since May 1996 and has served as the general partner of Penman since 1992, was a member of AFC's Audit and People Services Committees, and signed the Prospectuses for both AFC offerings as well as the 2001 10-K. ¶¶45-46, 94. As discussed above, Defendant Pennington's role on the audit committee was, *inter alia*, to ensure the veracity of AFC's financial statements and to correspond with Arthur Andersen regarding the same. ¶¶ 222-23. Defendant Spogli also serves on the advisory board of the Penman Fund, and as mentioned above, was involved with the executive committee and was a signatory to both AFC offerings. ¶ 44. Through its stock ownership and the high-level position of their partners within AFC, Defendant Penman had intimate and detailed knowledge of AFC's financial position. ¶244. Thus, Defendants Freeman Spogli and Penman had control over the general affairs of AFC, and the requisite power to directly or indirectly control or influence the specific corporate policy, which resulted

- 102 -

in the dissemination of the false and misleading statements as described by Plaintiffs.

See Brown, 84 F.3d at 396-97.

### 5. The Complaint Adequately Alleges Control Person Claims Against the Outside Director Defendants

Despite the fact that the Complaint alleges that the Director Defendants signed the false and misleading Prospectus and Registration Statement and exercised control over AFC's activities, the Director Defendants argue that they are not liable under Section 20(a) or Section 15 because they erroneously claim that liability is based solely on their status as directors and/or audit committee members. Dir. Def. Br. at 32. Defendants Doran, Wardlaw, Figel, Starrett, Roth and Spogli all signed the prospectus containing the false and misleading misrepresentations complained of as the basis for the Section 11 violation. ¶¶ 37-41. Additionally, Defendants Doran, Wardlaw, Figel, Roth and Spogli not only exercised control by their own actions and positions, but did so as well through their positions and equity interest at Freeman Spogli. ¶¶ 37, 39-40, 43-44. See In re Indep. Energy Holdings PLC Sec. Litig., 154 F. Supp. 2d 741, 772 (S.D.N.Y. 2001) (allegations that defendants were directors, held substantial equity stake in company and signed prospectus were sufficient to establish control).

Further support for controlling person liability is evidenced by the fact that Defendant Figel served on AFC's audit committee, which as mentioned in more

detail above, was responsible for ensuring the veracity of AFC's financial statements and reviewing internal audit procedures and controls. ¶ 40. Also, Defendants Roth and Spogli served as members of the Executive Committee and the People Services Committee of AFC. ¶¶ 43-44. This case is analogous to the Court's ruling in ValuJet, where controlling-person liability was found to be adequately alleged against an outside director premised on his position as director (which allowed him control over the company's general affairs) and his signing of a financial statement containing material misrepresentations and omissions. 984 F. Supp. at 1480. See also Miller Indus., 12 F. Supp. 2d at 1333 (allegations that defendants, as a result of their positions as officers and/or directors, could control general affairs of violating entity was sufficient to state a cause of action for controlling person liability). Therefore, as a consequence of their positions on the AFC Board of Directors, their stock ownership through Freeman Spogli, and their signing of the prospectus and registration statements containing false and misleading information, these Defendants had the requisite power to directly or indirectly control or influence the general affairs of AFC and the specific corporate policy that resulted in the primary violation. Brown, 84 F.3d at 396.

The Director Defendants also argue that there is a lack of "specific" allegations regarding the "specific role" that they played in controlling or influencing "specific

- 104 -

corporate policy," and thus, it cannot be reasonably inferred that they are control persons. Dir. Def. Br. at 32. Defendants fail to recognize that, in the Eleventh Circuit, Plaintiffs are not required to allege the "specific role" that Defendants played in controlling or influencing the specific corporate policy resulting in the liability. See Brown, 84 F.3d at 396. Thus, Defendants' reliance on cases from other courts is unpersuasive. Plaintiffs have sufficiently alleged controlling person liability against the Director Defendants.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that Defendants' Motions to Dismiss be denied.

Date: July 19, 2004                    Respectfully submitted,

                                       **CHITWOOD & HARLEY, LLP**

                                       By: _____
                                          Martin D. Chitwood
                                          Georgia Bar No. 124950
                                          Edward H. Nicholson, Jr.
                                          Georgia Bar No. 543420
                                          David J. Worley
                                          Georgia Bar No. 776665
                                          Meryl W. Edelstein
                                          Georgia Bar No. 238919
                                          Joseph P. Helm, III
                                          Georgia Bar No. 289935
                                          2300 Promenade II
                                          1230 Peachtree Street, N.E.

Atlanta, GA  30309
Tel: (404) 873-3900
Fax: (404) 876-4476

**MILBERG WEISS BERSHAD HYNES &
SCHULMAN LLP**
Maya Saxena
Robert R. Adler
Joseph E. White, III
5355 Town Center Road
Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**LERACH COUGHLIN STOIA &
ROBBINS, LLP**
William S. Lerach
Darren Robbins
401 B Street, Suite 1700
San Diego, CA  92101-4297
Tel: (619) 231-1058
Fax: (619) 231-7423
**Co-Lead Counsel for Plaintiffs**

## **Local Rule 7.1D Certification**

Counsel for Plaintiffs hereby certifies that the text of this Pleading has been prepared with Times New Roman 14 point, one of the fonts and point selections approved by the Court in Local Rule 5.1B.

Meryl W. Edelstein
Georgia Bar No. 238919
**CHITWOOD & HARLEY, LLP**
2300 Promenade II
1230 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 873-3900
Fax: (404) 876-4476

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing

**"PLAINTIFFS' OMNIBUS REPONSE TO DEFENDANTS' MOTIONS TO**

**DISMISS THE CONSOLIDATED AMENDED CLASS ACTION**

**COMPLAINT"** was served by United States mail, postage pre-paid, this 19th day of

July, 2004, upon all co-counsel listed on the attached Service List; and upon defense

counsel by hand delivery.

By: _____

        Meryl W. Edelstein
        Georgia Bar No. 238919
        **CHITWOOD & HARLEY, LLP**
        1230 Peachtree Street, NE
        2300 Promenade II
        Atlanta, Georgia  30309
        404-873-3900 (phone)
        404-876-4476 (fax)

- 108 -

## SERVICE LIST

**CHITWOOD & HARLEY LLP**
Martin D. Chitwood
Edward H. Nicholson, Jr.
David J. Worley
Meryl W. Edelstein
Joseph P. Helm, III
2300 Promenade II
1230 Peachtree Street, N.W.
Atlanta, GA 30309
Tel: (404) 873-3900
Fax: (404) 876-4476

**MILBERG WEISS BERSHAD
HYNES & SCHULMAN, LLP**
Maya Saxena
Robert R. Adler
Joseph E. White, III
5355 Town Center Road, Suite 900
Boca Raton, FL 33486
Tel: (561) 361-5000
Fax: (561) 367-8400

**MILBERG WEISS BERSHAD
HYNES & SCHULMAN, LLP**
Steven G. Schulman
Andrei Rado
One Pennsylvania Plaza
New York, NY 10019
Tel: (212) 594-5300
Fax: (212) 868-1229

**LERACH COUGHLIN STOIA &
ROBBINS, LLP**
William S. Lerach
Darren Robbins
401 B Street, Suite 1700
San Diego, CA 92101-4297
Tel: (619) 231-1058
Fax: (619) 231-7423

**Co-Lead Counsel for Plaintiffs**

**KING & SPALDING LLP**
M. Robert Thornton
Michael R. Smith
John P. Brumbaugh
Lex M. Erwin
191 Peachtree Street
Atlanta, GA 30303-1763
Tel: (404) 572-4600
Fax: (404) 572-5100

Counsel for AFC Enterprises, Inc.,
Frank J. Belatti, Samuel N. Frankel,
Dick R. Holbrook, and Gerald J.
Wilkins

**PARKER HUDSON RAINER &
DOBBS, LLP**
David G. Russell
J. Marbury Rainer
Angela Slate Rawls
1500 Marquis Tower Two
285 Peachtree Center Avenue
Atlanta, Georgia 30303
(404) 523-5300
(404) 522-8409 (fax)

Counsel for Mark J. Doran, Paul Farrar,
Matt L. Figel, Penman Private Equity
and Mezzanine Fund, Kelvin
Pennington, John M. Roth, Freeman
Spogli & Co., Ronald P. Spogli, Peter
Starrett, and William M. Wardlaw

**POWELL, GOLSTEIN, FRAZER &
MURPHY LLP**
W. Scott Sorrels
John R. Bielema, Jr.
191 Peachtree Street, N.E.

Sixteenth Floor
Atlanta, Georgia 30303
(404) 572-6600
(404) 572-6999 (fax)

**PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP**
Richard A. Rosen
1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
(212) 757-3990 (fax)

Counsel for Credit Suisse First Boston
Corp., Deutsche Bank Alex. Brown, and
Goldman, Sachs & Co.